[No. D046822. Fourth Dist., Div. One. June 29, 2006.]

CARLOS ESCAMILLA, Plaintiff and Respondent, v.
DEPARTMENT OF CORRECTIONS AND REHABILITATION, Defendant
and Appellant.

COUNSEL

Bill Lockyer, Attorney General, James M. Humes, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Heather L. Bushman and Lora Fox Martin, Deputy Attorneys General, for Defendant and Appellant.

Carl Fabian, under appointment by the Court of Appeal, for Plaintiff and Respondent.

OPINION

McDONALD, Acting P. J.—The State of California Department of Corrections and Rehabilitation (CDC) appeals an order granting inmate Carlos Escamilla's petition for a writ of habeas corpus and awarding him $225 for personal property CDC did not return to him. On appeal, CDC contends the order should be reversed because: (1) a writ of habeas corpus cannot be used for recovery of personal property or money damages; (2) Escamilla's claim is barred by his failure to comply with the claims presentation requirements of the California Tort Claims Act (the Act) (Gov. Code, § 810 et seq.);[1] and (3) there is insufficient evidence to support the trial court's findings. We requested, and have received and considered, supplemental briefs submitted by the parties on the issue of whether Escamilla's petition for writ of habeas corpus should be treated as a petition for writ of mandamus seeking specific recovery of his personal property or its value and therefore is not a "claim[] for money or damages" pursuant to section 905.2.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2003, Escamilla was an inmate at the Calipatria State Prison. At 9:21 a.m., he purchased $70 worth of items at the prison's canteen that were then placed in canteen bags.[2] He left the canteen and sat outside of the exercise yard with his canteen bags, waiting for an order to return to his assigned cell. He was wearing a pair of Levi's jeans, a pair of Reebok tennis shoes, a Nike sweatshirt, and a Seiko wristwatch.

---

[1] All statutory references are to the Government Code unless otherwise specified.

[2] His canteen receipt shows he bought over 100 items, consisting mostly of food items.

Shortly after 10:00 a.m., a prison riot began in the exercise yard between certain inmates and prison guards.[3] After the riot ended, Escamilla was escorted from the exercise yard by a guard (apparently correctional officer J. Nava), who helped Escamilla carry his canteen bags. Escamilla was placed in an administrative segregated housing unit ("AdSeg" or SHU) pending an internal investigation regarding his participation in the riot. Sergeant Valenzuela stopped Escamilla en route to the SHU and told him he was going to the "hole." Escamilla requested that Valenzuela have his canteen items placed together with the rest of his personal property. Valenzuela replied: " 'No! That goes to the trash!' " On his arrival at the SHU, in view of the SHU's staff under Valenzuela's supervision, Escamilla placed his Levi's jeans, Reebok shoes, Nike sweatshirt, and Seiko wristwatch inside his canteen bags, together with his canteen items, to protect his property from being thrown away in the trash.

On November 23, Escamilla signed an inmate property inventory form (CDC 1083) that, on its face, appeared to itemize personal property taken from cell A3-211L (apparently Escamilla's regular cell) after he had been placed in the SHU.[4]

On March 19, 2004, Escamilla was released from the SHU, but the clothing, watch, and canteen items that he possessed on his person on his November 21, 2003 arrival at the SHU were not returned to him. Apparently on that date, a notation was added to the November 23, 2003 inventory form that "[inmate] claims to be missing approx. $80.00 of canteen items he had just received. Claims he still had canteen item[s] on the yard."

On or about March 28, 2004, Escamilla filed a "first level" inmate appeal form, substantially setting forth the facts as described, *ante*, and stating: "Whether the Items were thrown in 'The Trash' as ordered by Sergeant Valenzuela or [were lost] by Staff, I am hereby demanding a redress of the value of each Item above[ ]mentioned. A Total amount of $255.00." He requested the following action: "I am hereby demanding a redress of the value of the following items that were confiscated: A pair of Levi's valued at $40.00, A pair of Tennis Shoes ([Reeboks]) valued at $65.00, A Sweat shirt (NIKE) valued at $30.00, A Wrist-Watch (SEIKO) valued at $50.00, the loss of [the] (canteen) valued at $70.00. Total Amount of $255.00." Escamilla subsequently submitted a copy of his canteen receipt dated November 21, 2003, showing the items purchased and amounts he paid for those canteen items. In partially granting Escamilla's first level appeal, Sergeant Brown noted Nava stated that Escamilla "was in boxers. I never [saw] any clothes.

---

[3] Several inmates and prison guards were injured during the riot.

[4] During his four-month placement in the SHU, Escamilla's SHU unit apparently was A5-141L.

He did have some canteen items. I don't know how much canteen he had. I don't remember if the canteen went to A-5 or with him." Brown also noted that Valenzuela stated: "I never saw any canteen. I was in and out of A-5 that day. [Escamilla] never said anything to me about his property that I recall." Brown concluded: "You [Escamilla] provided receipts for $70 of canteen items purchased on November 21, 2003. Officer Nava verified that you had a bag of canteen items with you. It appears that your canteen never got put into your property and was misplaced and lost. You will be compensated for $70 of canteen. However, you provided no proof that the clothing items you claim were lost were on your person when you went to Ad Seg. Neither of the staff interviewed recall you having these clothing items with you on the yard. Therefore, you will not be compensated for those items."

On or about August 8, Escamilla filed a "second level" appeal, asserting that the first level response was inadequate in that it did not award him compensation for his missing clothing and watch. Escamilla argued: "[I]t appears that [CDC] fails to [realize] that a prisoner [is] require[d] to be fully clothed when going to [the] Canteen. Here, the evidence shows that minutes after I had picked-up my Canteen, the incident occurred and the yard went down. Therefore, the preponderance of the evidence demonstrates that: 1). When I went to pick-up my Canteen [items] I was fully clothed, as required by the Rules, and [did] not just [have] on my boxers; and, 2). That I remained fully clothed until I was escorted to Ad.-Seg. whereat I stripped and placed aforementioned items in the bag together with the Canteen [items] I had just bought to ensure myself that the personal property together with the Canteen [items] would be protected from being 'thrown in the trash.' " In denying Escamilla's second level appeal, Chief Deputy Warden Ochoa stated:

"It is reasonable to assume you were fully clothed when you went to [the] canteen; however, you have not provided proof as to whether you were wearing personal clothing or state clothing. It is possible for an inmate to be fully dressed without wearing any personal property. Additionally, all the staff mentioned by you as having knowledge of this issue were interviewed, and none of them recall seeing any personal clothing items on you when they escorted you to Ad Seg.

"M. Jimenez, R&R Sergeant, was contacted and asked to review your property file to determine if you were ever issued, via R&R, any of the items you claim to be missing. After reviewing your property file, Sergeant Jimenez stated there is no documentation in your file that you have ever received a wristwatch or a pair of Reebok shoes. Sergeant Jimenez said you did have three pairs of Levi jeans and a gray sweatshirt, all of which were issued to you on March 19, 2004 with your property. Sergeant Jimenez also mentioned you had been brought to R&R to be compensated for the lost canteen items,

at which time you refused to accept compensation, stating you were not willing to accept partial compensation and you still wanted to be reimbursed for the missing personal clothing items."[5]

On or about September 26, Escamilla filed a "third level" appeal, asserting the second level response was without merit and based on prevarications. Escamilla argued that Ochoa did not substantiate Jimenez's statement with Escamilla's "Property Card File Record" (a copy of which Escamilla asserted he was not authorized to obtain). He asserted it was CDC's responsibility to obtain that property record in weighing the officer's word against his. In denying Escamilla's third level appeal, CDC Inmate Appeals Chief Grannis (by T. Surges) stated: "Staff cannot be held responsible for the loss of items that they had no control over. There is no credible evidence presented by [Escamilla] to establish that he ever possessed the items he listed as missing or that he was wearing them at the time he was placed in ASU. Staff verified and [Escamilla] produced receipts for the canteen items noted by [Escamilla]. As a result, [Escamilla] was compensated for $70.00 worth of canteen items. Absent verifiable evidence that he was in authorized possession of the other items listed as missing, there is no negligence established and no compensation is due to [Escamilla]."[6]

On January 28, 2005, Escamilla filed the instant petition for writ of habeas corpus against Stuart J. Ryan (apparently the acting warden of CDC's Calipatria State Prison), substantially alleging the facts as described *ante* and: "[T]he fact that the CDC-1083, Inmate Property Inventory Form, is not to be found in file at R&R gives evidence that staff at SHU never filled it in [on November 21, 2003], but rather followed Sergeant Valenzuela's orders to 'Throw [Escamilla's] [p]ersonal property in the trash.' Had staff at SHU filled in the CDC-1083, Inmate Property Inventory Form, as they were compelled to do so by Rules, Regulations and Law, the Form would be filed in [Escamilla's] Property File; and there would be no question as to what [p]ersonal [p]roperty [Escamilla] had [on] his person when he entered SHU [on November 21, 2003]. As stated in [my] Appeal: [¶] 'I placed the items inside the bags of canteen I had just bought.' [Citation.]" Escamilla requested that the trial court grant his petition and issue an order directing CDC or State Board of Control to "redress" him in the amount of $255 for his lost canteen and personal property listed in his petition.

On March 14, 2005, the trial court issued an order to show cause (OSC) why the relief in Escamilla's petition should not be granted. CDC filed a

---

[5] According to Escamilla, in exchange for his $70 worth of canteen items, Jimenez offered him property that had been confiscated from other inmates. Escamilla was not offered the same items he had purchased from the canteen or $70 in lieu thereof.

[6] Contrary to the implication therein, Escamilla had not yet been compensated $70 for his missing canteen items.

return to the OSC, arguing Escamilla had not exhausted his administrative remedies because he failed to fully comply with the Act's claims presentation requirements. It also argued that a petition for writ of habeas corpus was not the proper remedy for an inmate seeking monetary damages for a property claim. Finally, it argued there was insufficient evidence to support Escamilla's claim. Escamilla filed a traverse denying the arguments made in CDC's return.

On June 6, the trial court issued an order granting Escamilla's petition, stating: "The Court is unpersuaded by CDC's return. This Court finds good cause to grant [Escamilla's petition for] writ of habeas corpus. Relief in the form of $225 is awarded to [Escamilla] which shall be placed in [his] trust account, or credited to a canteen account, as [he] may choose."[7]

CDC timely filed a notice of appeal.

## DISCUSSION

### I

*Escamilla's Petition as a Petition for Writ of Mandamus*
*Seeking Specific Recovery of His Personal Property or Its*
*Value and Application of the Act*

We requested, and have received and considered, supplemental briefs on the issues of whether Escamilla's petition for writ of habeas corpus should be treated as a petition for writ of mandamus seeking recovery of personal property or its value and application of the Act.

### A

■ The Act sets forth a claims presentation requirement for "all claims for money or damages against the state" (§ 905.2, subd. (b)) and generally provides that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented [under the Act's provisions] until a written claim therefor has been presented to the public entity" and rejected by the Victim Compensation and Government Claims Board (the Board) (formerly the Board of Control). (§§ 945.4, 900.2, subd. (b).)

---

[7] Although the petition for writ of habeas corpus was filed against Ryan, as warden of CDC's prison in which Escamilla was incarcerated, because the trial court considered CDC to be the respondent to the petition, we shall assume CDC is the party subject to the trial court's order and to the instant appeal.

In *Minsky v. City of Los Angeles* (1974) 11 Cal.3d 113 [113 Cal.Rptr. 102, 520 P.2d 726] (*Minsky*), the Supreme Court addressed the issue of whether the Act's claims presentation requirements "apply to an action by an arrestee for the return of property taken by local police officers at the time of arrest and wrongfully withheld following the disposition of criminal charges." (*Id.* at pp. 116–117.) In that case, police officers took $7,720 from Michael Joseph Marino on his arrest and allegedly wrongfully detained and converted it by transferring it to the policeman's and fireman's pension fund.[8] (*Minsky, supra,* 11 Cal.3d at pp. 117–118.) *Minsky* stated: "We do not think that the claims statutes were intended to cover a case in which the city takes the property of an arrested person, holds it as a bailee, and retains it for the city's own use. Hence plaintiff's failure to comply with those statutes erects no bar to a cause of action for the return of the property so seized and retained. In reaching this conclusion, we observe that the language of section 905 makes clear that the requirements for presentation of claims apply only to 'claims for money or damages' and not to claims for other forms of relief, such as specific recovery of property taken by the city as a bailee."[9] (*Minsky, supra,* 11 Cal.3d at p. 117.) *Minsky* reasoned: "A claim for the specific recovery of property has never been considered a claim for 'money or damages' as used in section 905 and its predecessors. '[O]nly claimants seeking money or damages, as distinguished from other types of judicial relief, are required to conform to the claims procedure.' The claims statutes do not 'impose any . . . requirements for nonpecuniary actions, such as those seeking injunctive, *specific*, or declaratory relief.' [Citation.] (Italics added.) 'Where a wrongdoer has converted . . . personal property, the injured owner must elect between his right of ownership and possession (with the remedy of specific recovery) and his right to compensation (with the remedies of damages for conversion or quasi-contract recovery of value on theory of waiver of tort).' [Citation.]" (*Minsky,* at p. 121, fns. omitted.)

In the circumstances of *Minsky,* the court concluded: "[T]he government in effect occupies the position of a bailee when it seizes from an arrestee property that is not shown to be contraband. [Citation.] The arrestee retains his right to eventual specific recovery, whether he seeks to regain tangible property like an automobile, ring, wallet or camera, or whether he seeks to recover a specific sum of money which, under general constructive trust principles, is traceable to property within the possession of the defendant. [Citations.]" (*Minsky, supra,* 11 Cal.3d at p. 121, fn. omitted.) *Minsky* then noted: "[*E*]*ven if the money taken from arrestee Marino is no longer*

---

[8] Marino later assigned his claim against the City of Los Angeles to his attorney, who then assigned that claim to plaintiff Bernard W. Minsky. (*Minsky, supra,* 11 Cal.3d at p. 118.)

[9] Like section 905.2, subdivision (b), section 905 generally provides that "[t]here shall be presented in accordance with [the Act's provisions] all claims for money or damages against local public entities . . . ."

*traceable to any property presently in defendant's possession and thus is not strictly available for specific recovery, we believe that plaintiff's cause of action would not be foreclosed by the claims statutes.* As discussed above, after a local governmental entity wrongfully withholds an arrestee's property, the arrestee clearly can seek specific recovery of the property while it is still in the possession of the local entity without being limited to the relatively short period for filing claims set forth in the claims statutes. *This initial exemption of the action from the claims statute is not lost simply because the city takes the further wrongful step of disposing of the bailed property. The city cannot be permitted to invoke the claims statute, originally not available to it, by virtue of a later wrongful dissipation of the property. To so hold would be in effect to allow the local entity to profit by its own wrong, penalizing a plaintiff who, in light of the specific recovery remedy apparently available to him, justifiably did not file a claim."* (*Minsky, supra,* 11 Cal.3d at pp. 121–122, fn. 14, italics added.) Furthermore, *Minsky* concluded that a complaint's failure to expressly seek specific recovery of property does not preclude that theory of recovery if the facts alleged therein are sufficient to support a claim for specific recovery. (*Id.* at pp. 121–122.) *Minsky* also noted: "A defendant in a criminal proceeding clearly has the right to obtain mandamus to compel the return of personal property wrongfully withheld by the custodial officers. [Citations.] Mandamus lies in the criminal proceeding even after disposition of the criminal charges. [Citation.] No court has intimated or held that the claims statute applies to the arrestee directly seeking mandamus in a criminal proceeding to compel the return of property wrongfully in the possession of custodial officers. We perceive no reason why the plaintiff, as the arrestee's assignee, should be in any different position merely because he proceeds in a civil action." (*Id.* at p. 123.) *Minsky* concluded: "In sum, we hold that the instant complaint, seeking the recovery of property seized and wrongfully withheld by defendants, does not involve a claim for 'money or damages' within the meaning of section 905, and thus would not fall within the [Act's claims] presentation requirements . . . ." (*Id.* at p. 124.)

Subsequently, in *Holt v. Kelly* (1978) 20 Cal.3d 560 [143 Cal.Rptr. 625, 574 P.2d 441] (*Holt*), the Supreme Court held that "an arrestee who seeks in good faith to specifically recover property taken from him at the time of his arrest is exempt from the claim filing provisions of the Government Code, even though some or all of the property may have been dissipated and respondent may be compelled to respond in damages in lieu of property." (*Id.* at p. 565, fn. omitted.) In *Holt*, the petitioner was arrested by a county sheriff's deputy and taken to a county jail, along with the petitioner's footlocker trunk, for overnight detention. (*Id.* at p. 563.) He was not given a receipt for his trunk or its contents. (*Ibid.*) The day after his arrest, the petitioner was transferred to another county's jail and its booking officer

completed a jail arrest record which included a "property receipt" section. (*Ibid.*) That section described the petitioner's personal property, including the handwritten notation " '1-Ft. Locker—Contents—(Clothes—tools, hand tools, . . .) . . . .' " (*Ibid.*) The petitioner was not given that form or any other receipt for his property. (*Ibid.*) No inventory was taken of the trunk's contents. (*Ibid.*) When the petitioner's property was not returned after his release, he filed a petition for writ of mandate seeking return of 32 items of property (or the value of that property) taken by the county sheriff on his arrest. (*Id.* at p. 562.) A court-appointed referee found that all of the property claimed by petitioner had been taken by the county sheriff, but none of it was returned to him. (*Ibid.*) The value of the property was $500. (*Ibid.*) The Supreme Court independently reviewed the record and concluded the referee's findings were supported by, and correctly interpreted, the evidence. (*Id.* at p. 563.) Because the county sheriff had a duty to return the claimed property to the petitioner, the Supreme Court, citing *Minsky*, concluded a writ of mandate was appropriate to compel the return of that property. (*Holt*, at p. 564.) *Holt* quoted language from *Minsky*, including footnote 14, and concluded: "For the foregoing reasons we hold that an arrestee who seeks in good faith to specifically recover property taken from him at the time of his arrest is exempt from the [Act's] claim filing provisions . . . , even though some or all of the property may have been dissipated and respondent may be compelled to respond in damages in lieu of property. . . . Respondent may not convert his wrongful dissipation of the property into an advantage by using it to support an essentially dilatory defense based on failure to comply with the claims statutes." (*Holt*, at p. 565, fn. omitted.) Rejecting the respondent's argument that the petitioner's claim was for damages, *Holt* stated: "Respondent contends that since some or all of the property is now unavailable he is responsible only by means of a proper claim for money damages and not in mandamus. This position is without merit, especially in light of the fact that any property now missing is the result of respondent's own misconduct. We have heretofore held that mandamus may be brought to start the chain of action designed to compel a ministerial duty by a public officer, even if the ultimate goal may be recovery of a sum of money. [Citations.] It is also clear that mandamus will lie where the recovery of money is merely ancillary to an underlying proceeding which seeks performance of a ministerial duty. [Citations.]" (*Holt*, at p. 565, fn. 5.) Accordingly, the Supreme Court in *Holt* disposed of the appeal as follows: "Let a writ of mandate issue directing respondent to return to petitioner the property found by the referee to have been withheld from him, and if respondent is unable to do so, to deliver to petitioner the value thereof, i.e., the sum of $500." (*Holt*, at p. 566.)

In *Long v. City of Los Angeles* (1998) 68 Cal.App.4th 782 [80 Cal.Rptr.2d 583], the court applied the Supreme Court's holdings in *Minsky* and *Holt* in reversing a summary judgment against a plaintiff in his action for

specific recovery of personal property. (*Long,* at pp. 784, 786–787.) In *Long,* the City of Los Angeles seized 525 birds, along with their cages and related items, which the plaintiff had kept at his home. (*Id.* at p. 784.) The plaintiff filed an action seeking return of his birds and other personal property, alleging the original seizure was unlawful and some of the birds had died or been injured while wrongfully detained by the city. (*Ibid.*) The city moved for summary judgment, asserting the plaintiff had not complied with the Act's claims presentation requirements. (*Id.* at p. 785.) The trial court granted the motion and entered summary judgment for the city. (*Ibid.*) On appeal, *Long* stated: "Significantly, the Supreme Court in *Holt* held that *where confiscated property is lost and cannot be returned due to the government's own negligence, the government may not benefit from its own wrongdoing by contending the resulting action, necessarily limited to monetary damages, is subject to the [Act].*" (*Id.* at p. 786, italics added.) *Long* concluded: "This case is governed by *Holt* and *Minsky. Although plaintiff sought relief via injunction rather than writ of mandate, the procedural distinction is meaningless for our purposes.* As in *Holt,* plaintiff swiftly and in good faith pursued the return of his personal property, thus fulfilling '[t]he policy of providing prompt notice of claims to governmental entities which underlies the claims statute [citation] ? .' (*Holt v. Kelly, supra,* 20 Cal.3d at p. 565.) *Having allegedly wrongfully destroyed plaintiff's property, the city may not cite the claims filing statute as a defense to what has become, by virtue of the city's purported misconduct, a damages action.* We conclude, as a matter of law, the city is not entitled to summary judgment based upon plaintiff's failure to comply with the claims filing statutes." (*Long,* at p. 787, italics added.) Accordingly, the court reversed the summary judgment in the city's favor. (*Id.* at p. 788.)

**B**

■ Because the circumstances in this case are substantially apposite to those in *Minsky, Holt,* and *Long,* we conclude Escamilla's petition for writ of habeas corpus should be treated as a petition for writ of mandamus seeking specific recovery of his personal property or its value and therefore is not a "claim[] for money or damages" pursuant to section 905.2. Although Escamilla asserts a writ of habeas corpus is an appropriate writ to remedy the loss of his personal property, we need not decide that question because he alternatively argues his petition could be treated as a petition for a writ of mandate. Under *Minsky* and *Holt,* the most appropriate writ to direct the government to return personal property or its value in a bailment or bailment-like situation is a writ of mandamus. (*Minsky, supra,* 11 Cal.3d at p. 123; *Holt, supra,* 20 Cal.3d at pp. 564, 565, fn. 5.) As quoted *ante, Minsky* stated: "A defendant in a criminal proceeding clearly has the right to obtain mandamus to compel the return of personal property wrongfully withheld by the

custodial officers. [Citations.] Mandamus lies in the criminal proceeding even after disposition of the criminal charges. [Citation.] No court has intimated or held that the claims statute applies to the arrestee directly seeking mandamus in a criminal proceeding to compel the return of property wrongfully in the possession of custodial officers." (*Minsky,* at p. 123.) Likewise, citing *Minsky* as authority, *Holt* stated: "Petitioner seeks to recover either the property or its value by means of a writ of mandate. The availability of the mandamus remedy is governed by section 1085 of the Code of Civil Procedure, which provides in relevant part that the writ may issue 'to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station.' Since respondent is under a duty to return the claimed property to petitioner [citation], a writ of mandate is appropriate to compel its return. [Citation.]" (*Holt,* at p. 564.) *Holt* further stated: "We have heretofore held that mandamus may be brought to start the chain of action designed to compel a ministerial duty by a public officer, even if the ultimate goal may be recovery of a sum of money. [Citations.]" (*Id.* at p. 565, fn. 5.) In the circumstances of this case, Escamilla, like the plaintiff in *Minsky* and the petitioner in *Holt,* alleged that a custodial officer took personal property from him and wrongfully did not return it to him. Because that custodial officer (i.e., the prison warden on behalf of CDC) effectively acted as a bailee of Escamilla's personal property, a petition for writ of mandamus is the most appropriate writ for Escamilla to recover that property or its value from that custodial officer.[10]

---

[10] In *Minsky* and *Holt,* the courts cited a statute (§ 26640) that expressly imposes on a local law enforcement officer a duty to safely keep and return a prisoner's personal property. (*Minsky, supra,* 11 Cal.3d at p. 119, fn. 5;*Holt, supra,* 20 Cal.3d at p. 564.) Although that statute does not apply to a state officer, there are apposite statutory provisions that relate to a state prisoner's personal property and support our conclusion that a state custodial officer (e.g., CDC or state prison warden) generally has an equivalent duty to safely keep noncontraband personal property taken from a prisoner and return it to him or her on release from custody (or on termination of the reason the property was taken—e.g., release from the SHU). Penal Code section 2601, subdivision (a) generally provides that a state prisoner has a civil right to own personal property, although a prisoner may be deprived of that right during confinement "as is reasonably related to legitimate penological interests." (Pen. Code, § 2600.) More importantly, Penal Code section 2085, using language closely analogous to section 26640's language, provides: "The [CDC] shall keep a correct account of all money and valuables upon the prisoner when delivered at the prison, and shall pay the amount, or the proceeds thereof, or return the same to the prisoner when discharged." Although Penal Code section 2085 expressly requires return of a prisoner's valuables only "when discharged," we construe that statute's language and intent to be sufficiently broad as to create a duty for CDC to return Escamilla's personal property on his release from the SHU in the circumstances of this case. Furthermore, CDC's own regulations provide that it "shall accept liability for the loss or destruction of inmate personal property when it is established that such loss or destruction results from employee action." (Cal. Code Regs., tit. 15, § 3193, subd. (b).) Because Penal Code section 2085 is substantially apposite to section 26640, cited in *Minsky* and *Holt,* we conclude those

■ Although CDC summarily argues Escamilla waived his assertion that his petition should, alternatively, be considered as a petition for writ of mandamus because he did not raise that assertion in the trial court, CDC does not cite any case or other authority showing we are precluded from deciding the question of whether Escamilla's petition can be treated as a petition for writ of mandamus. On the contrary, because the question of whether Escamilla's petition can or should be considered to be a petition for writ of mandamus is "an issue of law not turning on disputed facts" and involves an important question of public policy, we exercise our discretion to consider and decide that question even though Escamilla did not raise it below. (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511].) Furthermore, because Escamilla's petition sufficiently alleged facts that would support its consideration as a petition for writ of mandamus, we, like the court in *Minsky*, are not precluded on appeal from considering that pleading to be a petition for writ of mandamus. (*Minsky*, *supra*, 11 Cal.3d at pp. 123–124.) ■ The label given a petition, action or other pleading is not determinative; rather, the true nature of a petition or cause of action is based on the facts alleged and remedy sought in that pleading. (Code Civ. Proc., § 425.10, subd. (a); *Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 931 [42 Cal.Rptr.3d 96]; *Loehr v. Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1080–1082 [195 Cal.Rptr. 576]; *Slater v. Blackwood* (1975) 15 Cal.3d 791, 795–796 [126 Cal.Rptr. 225, 543 P.2d 593].) ■ Furthermore, a complaint's failure to expressly seek specific recovery of property does not preclude that theory of recovery if the facts alleged therein are sufficient to support a claim for specific recovery. (*Minsky*, at pp. 121–122; cf. *MacIsaac v. Pozzo* (1945) 26 Cal.2d 809, 815 [161 P.2d 449]; *Masero v. Bessolo* (1927) 87 Cal.App. 262, 268 [262 P. 61]; *Von Schrader v. Milton* (1929) 96 Cal.App. 192, 198 [273 P. 1074].)

■ In this case, Escamilla's petition alleged that he had personal property on him when he was taken to the SHU on November 21, 2003. It further alleged that Valenzuela stated his canteen items would be placed in the trash. After his arrival at the SHU, his personal property was either lost or thrown away per Valenzuela's orders. On Escamilla's release on March 19, 2004, none of that personal property was returned to him. Therefore, Escamilla's petition alleged sufficient facts to support a petition for writ of mandamus

cases are apposite and apply to this case to the extent they are based, in part, on a governmental officer's duty to safely keep and return personal property of an arrestee or prisoner.

against the prison warden and CDC for return of his personal property or the value thereof. (*Minsky, supra,* 11 Cal.3d at p. 123; *Holt, supra,* 20 Cal.3d at pp. 564, 565, fn. 5.)[11]

CDC apparently asserts the fact that Escamilla's personal property was thrown away, destroyed, or otherwise disposed of by its staff converts Escamilla's claim for specific recovery of his personal property or its value into a claim "for money or damages" that requires compliance with the Act's claims presentation requirements. However, *"even if the [property taken from an arrestee] is no longer traceable to any property presently in defendant's possession and thus is not strictly available for specific recovery, we believe that plaintiff's cause of action would not be foreclosed by the claims statutes."* (*Minsky, supra,* 11 Cal.3d at pp. 121–122, fn. 14, italics added.) Furthermore, *Holt* stated that "an arrestee who seeks in good faith to specifically recover property taken from him at the time of his arrest is exempt from the claim filing provisions of the Government Code, even though some or all of the property may have been dissipated and respondent may be compelled to respond in damages in lieu of property." (*Holt, supra,* 20 Cal.3d p. 565, fn. omitted.) It further stated that "Respondent may not convert his wrongful dissipation of the property into an advantage by using it to support an essentially dilatory defense based on failure to comply with the claims statutes." (*Ibid.*) *Holt* rejected an argument similar to the one made by CDC in this case, concluding that because "any property now missing is the result of respondent's own misconduct," the respondent "may not convert his wrongful dissipation of the property" into a defense of noncompliance with the Act's claims presentation requirements because now the claim purportedly is one only for money or damages. (*Id.* at p. 565 & fn. 5; see also *Long v. City of Los Angeles, supra,* 68 Cal.App.4th at pp. 786–787.) CDC's wrongful

---

[11] CDC asserts that since the trial court's order granting Escamilla's petition was issued, it has paid him $225 to satisfy that order. Based on that postorder action, CDC argues a writ of mandamus cannot now be issued because there is no action remaining for CDC to take to remedy its wrongful withholding of Escamilla's personal property. However, the record on appeal does not contain any evidence showing CDC has satisfied the trial court's order, nor has CDC sought to augment the record with, or requested judicial notice of, any postorder documents or other evidence. Therefore, we do not address CDC's assertion that a writ of mandamus cannot be issued. In any event, our opinion interprets the trial court's order as effectively granting Escamilla's petition for writ of mandamus, rather than a writ of habeas corpus. Therefore, because *at the time of the trial court's order* CDC presumably had not paid Escamilla's claim, there remained an action that the trial court could direct CDC to take by writ of mandamus (i.e., payment of $225 to Escamilla). We further note that although CDC argues it has paid that amount to Escamilla since the issuance of the trial court's order, neither party has moved for dismissal of the appeal based on mootness and we decline to dismiss the appeal on our own motion as the issues appear to involve a matter of continuing public importance that is likely to recur between CDC and Escamilla and/or other inmates. (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1001 [111 Cal.Rptr.2d 564, 30 P.3d 57]; *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737].)

dissipation of Escamilla's personal property does not convert his claim for specific recovery of his personal property (or the value thereof) into a claim "for money or damages" that requires compliance with the Act's claims presentation requirements.

■ Finally, although we have concluded Escamilla was not required to comply with the Act's claims presentation requirements before filing the instant petition, we nevertheless note that the purposes of the Act's claims presentation requirements were essentially satisfied in the circumstances of this case. As *Minsky* noted: "The policy underlying [the Act's claims presentation requirements] is to afford prompt notice of claims to governmental entities. [Citations.] The courts and commentators have considered prompt notice important for several reasons: to allow (1) early investigation of the facts, (2) informed fiscal planning in light of prospective liabilities, (3) settlement of claims before the initiation of costly civil litigation, and (4) avoidance of similarly caused future injuries or liabilities. [Citations.] None of these reasons apply to the governmental entity owing an affirmative statutory duty to hold private property for eventual return to the lawful owner." (*Minsky, supra*, 11 Cal.3d at pp. 123–124.) Escamilla filed three appeals (i.e., "first level," "second level," and "third level" appeals) in accordance with CDC's internal appeal requirements in an attempt to obtain the return of his personal property or the value thereof. CDC does not assert that any of those appeals were untimely. Accordingly, CDC was given prompt notice of Escamilla's claim prior to his filing of the instant petition, which gave it an opportunity to conduct an early investigation of his claim and attempt to settle that claim and avoid similarly caused future injuries or liabilities. We are not persuaded that the public policy purposes of the Act's claims presentation requirements were, in the circumstances of this case, substantially contravened or undermined by Escamilla's filing of the instant petition without first filing a claim under section 905.2. (*Minsky*, at pp. 123–124.)[12]

## II

*Substantial Evidence to Support the Trial Court's Findings*

CDC contends the evidence is insufficient to support the trial court's findings. However, in so doing, CDC misconstrues or misapplies the applicable substantial evidence standard of review.

---

[12] Because we dispose of the issue of compliance with the Act's claims presentation requirements on the grounds discussed *ante*, we need not, and do not, address Escamilla's assertion that his compliance with CDC's internal appeal procedures was an alternative or independent method of complying with the Act's claims presentation requirements.

A

A judgment of a trial court "is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) This is particularly true when the appellant "did not request a statement of decision or findings of fact. Under these circumstances, all intendments favor the ruling below [citation], and we must assume that the trial court made whatever findings are necessary to sustain the judgment. [Citation.]" (*Michael U. v. Jamie B.* (1985) 39 Cal.3d 787, 792–793 [218 Cal.Rptr. 39, 705 P.2d 362], superseded by statute on another ground as noted in *In re Zacharia D.* (1993) 6 Cal.4th 435, 448 [24 Cal.Rptr.2d 751, 862 P.2d 751].) Furthermore, "[t]he burden of demonstrating error rests on the appellant. [Citation.]" (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].)

"When the trial court has resolved a disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule. If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co., supra*, 68 Cal.App.4th at p. 632.) In applying the substantial evidence standard of review, " 'the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].) "The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial. [Citation.]" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96].) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citations.] 'Substantial evidence . . . is not synonymous with "any" evidence.' . . . [Citations.] The focus is on the quality, rather than the quantity, of the evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630 [85 Cal.Rptr.2d 386].) Alternatively stated, we do not evaluate the credibility of the witnesses or otherwise reweigh the

evidence. (*Id.* at p. 629.) Rather, "we defer to the trier of fact on issues of credibility. [Citation.]" (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 [108 Cal.Rptr.2d 34].)

## B

We conclude there is substantial evidence to support the trial court's findings in support of its order. In granting Escamilla's petition and directing CDC to pay him $225, the trial court stated: "The Court is unpersuaded by CDC's return. This Court finds good cause to grant [Escamilla's petition for] writ of habeas corpus." Because the trial court's order does not state any *specific* findings of fact, we presume its order is correct, make all intendments in its favor, and assume it made whatever findings are necessary to sustain the order. (*In re Marriage of Arceneaux, supra,* 51 Cal.3d at p. 1133; *Michael U. v. Jamie B., supra,* 39 Cal.3d at pp. 792–793.)

In Escamilla's verification of his petition, he declared under penalty of perjury that the petition and its contents were true of his own knowledge. The petition asserted that at 9:21 a.m. on November 21, 2003, Escamilla, a prison inmate, purchased $70 worth of items at the prison's canteen that were then placed in canteen bags. A receipt showing the items purchased and amounts paid was attached to Escamilla's petition. Escamilla carried his bags out of the canteen and sat outside of the exercise yard, waiting for an order to return to his assigned cell. He was wearing a pair of Levi's jeans, a pair of Reebok tennis shoes, a Nike sweatshirt, and a Seiko wristwatch.

Shortly after 10:00 a.m., a prison riot began in the exercise yard between certain inmates and prison guards. After the riot ended, Escamilla was escorted from the exercise yard by a guard (apparently Nava), who helped Escamilla carry his canteen bags, and was placed in the SHU pending an internal investigation. Valenzuela stopped Escamilla en route to the SHU and told him he was going to the "hole." Escamilla requested that Valenzuela have his canteen items placed together with the rest of his personal property. Valenzuela replied: " 'No! That goes to the trash!' " On his arrival at the SHU, in view of the SHU's staff who were under Valenzuela's supervision, Escamilla placed his personal property (i.e., Levi's jeans, Reebok shoes, Nike sweatshirt, and Seiko wristwatch) inside his canteen bags together with his canteen items to protect his property from being thrown away in the trash.

Two days later (on November 23), Escamilla signed an inmate property inventory form (CDC 1083) that, on its face, appeared to itemize personal

property taken from cell A3-211L (apparently Escamilla's regular cell) after he had been placed in the SHU.[13]

On March 19, 2004, Escamilla was released from the SHU, but the clothing, watch, and canteen items that he possessed on his person on his November 21, 2003 arrival at the SHU were not returned to him. Apparently on that date, a notation was added to the November 23, 2003 inventory form that "[inmate] claims to be missing approx. $80.00 of canteen items he had just received. Claims he still had canteen item[s] on the yard."

Despite Escamilla's three subsequent internal appeals for recovery of his personal property or the payment of the value thereof, CDC did not either return those items to Escamilla or pay him the value thereof. He thereafter filed the instant petition, which we concluded was effectively a petition for writ of mandamus seeking recovery of his personal property or its value.

Based on the evidence presented in Escamilla's petition, we presume the trial court implicitly found that on Escamilla's arrival at the SHU on November 21, 2003, he was wearing a pair of Levi's jeans, a pair of Reebok shoes, a Nike sweatshirt, and a Seiko wristwatch and was carrying (with Nava's assistance) canteen bags containing items he recently purchased for $70. Furthermore, we presume the trial court implicitly found that on Escamilla's arrival at the SHU, its staff (under Valenzuela's supervision) took all of that personal property from Escamilla before placing him in the SHU cell. We further presume the trial court implicitly found that on Escamilla's release on March 19, 2004, that personal property was not returned to him, but rather had been wrongfully dissipated by CDC. Finally, we presume the trial court implicitly found CDC effectively acted as a bailee when it took Escamilla's personal property and, by not returning it on his release from the SHU, breached a duty it owed to him. We conclude the petition and its attached documents provide substantial evidence to support those implied findings made by the trial court.

CDC argues the documentary evidence attached to Escamilla's petition conclusively disproves his factual assertions. We are not persuaded by this argument. First, CDC notes the November 23, 2003 property inventory form (CDC 1083) reflects Escamilla's admission that "[t]he above listed items constitute all my personal property." CDC argues that the form's omission of a pair of Levi's jeans, a pair of Reebok shoes, a Nike sweatshirt, and a Seiko wristwatch necessarily shows either that Escamilla did not have those items on his person on his arrival at the SHU or that those items were already

---

[13] As noted *ante*, during his four-month placement in the SHU, Escamilla's SHU unit apparently was A5-141L.

included in items listed on the form. Although that may be one possible inference from the form, we conclude the trial court could, and did, reasonably infer the inventory form did not list any of the personal property taken from Escamilla on his November 21, 2003 arrival at the SHU. On its face, that form appears to itemize only personal property taken from cell A3-211L (apparently Escamilla's regular cell) on November 23, two days *after* he had been placed in the SHU. Therefore, the trial court could reasonably infer the November 23 property inventory form did *not* include items of personal property Escamilla had on his person on his November 21 arrival at the SHU. Therefore, the failure of the November 23 form to list certain items of personal property (Seiko wristwatch, Reebok shoes, etc.) does *not* conclusively prove Escamilla did not have those items on his person when he arrived at the SHU on November 21.

Furthermore, we conclude the trial court could, and did, reasonably infer Escamilla's March 19, 2004 acknowledgement on the November 23, 2003 form that he had received all of its listed items did not prove he did not have any personal property on him on his arrival at the SHU on November 21, 2003. On his March 19, 2004 release from the SHU, Escamilla apparently acknowledged on that form that he received all of the listed personal property (or noted any discrepancies). CDC argues that because the only notation of a discrepancy was Escamilla's claim of $80 in missing canteen items he possessed on his arrival at the SHU, the omission of any notation that he did not receive a pair of Levi's jeans, a pair of Reebok shoes, a Nike sweatshirt, and a Seiko wristwatch necessarily shows he did not have those items on his person on his arrival at the SHU or, alternatively, those items were already included in items listed on the inventory form. Although that may be one possible inference from the form, the trial court could, and did, reasonably infer the inventory form did not list any of personal property taken from Escamilla on his November 21, 2003 arrival at the SHU. We further conclude the trial court could, and did, reasonably infer the notation's omission of other personal property that was missing (Seiko wristwatch, Reebok shoes, etc.) was either an unintentional oversight or merely reflective of the fact that the form listed only property taken from Escamilla's regular cell (i.e., A3-211L). Finally, we conclude the trial court could, and did, reasonably infer the November 23, 2003 inventory form's listing of three pairs of Levi's and one gray sweatshirt did *not* reflect or describe items of personal property taken from Escamilla's person on his November 21 arrival at the SHU, but rather were clothing items later found and taken from his regular cell on November 23. To the extent CDC argues the trial court should have made contrary inferences and findings from the evidence, it misconstrues or misapplies the substantial evidence standard of review. Based on our review of the entire record, we conclude there is substantial evidence to support the trial court's findings.

## DISPOSITION

The order is modified to provide that it grants Escamilla's petition for writ of mandamus, rather than petition for writ of habeas corpus. As modified, the order is affirmed. Escamilla is entitled to costs on appeal.

McIntyre, J., and O'Rourke, J., concurred.