Filed 6/17/14  Taubman v. U.S. Bank N.A. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RICHARD J. TAUBMAN, | B243371 |
| Objector and Appellant, | (Los Angeles County Super. Ct. No. BP066539) |
| v. | |
| U.S. BANK, N.A., as Trustee etc., | |
| Defendant and Respondent. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Marvin M. Lager, Judge.  Affirmed.

        Richard J. Taubman, in pro. per., for Objector and Appellant.

        U.S. Bank, N.A. as Trustee of the Janice L. Taubman 1990 Revocable Trust, for Defendant and Respondent.

Richard J. Taubman, a beneficiary of the Janice L. Taubman 1990 Revocable Trust, appeals from an order approving in part, and disapproving in part, the trustee's amended second and final accounting. Richard[1] contends the trustee, with the assistance of its retained expert, properly valued the oil and gas interests held by the trust at $4,450,908 and the court's reduction of that valuation to $3,894,544.50 was not supported by substantial evidence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Formation of the Trust*[2]

In 1990 Janice established a revocable intervivos trust naming herself as sole trustee and her children, Anne and Richard, as beneficiaries. When she died in September 1999, the trust became irrevocable. Under the trust's terms Janice's various ownership interests in Seaport Village, a shopping center and tourist attraction in San Diego, were placed in a subtrust (the Seaport Village subtrust) for Anne; Richard and his son, Wyatt, were named contingent beneficiaries of the Seaport Village subtrust, entitled to benefit from those assets only if Anne did not survive Janice by 10 years. The subtrust's assets were to be distributed 10 years after Janice's death.

Janice's interests in business ventures other than Seaport Village, primarily interests in oil and gas leases, were placed in a subtrust for Richard. Under the terms of

---

[1]    Because Janice Taubman and her children, Richard and Anne, the beneficiaries of the trust, share the same surname, we refer to them by first names for clarity and convenience. (See *Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1191, fn. 1; *Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13.)

[2]    This court is no stranger to litigation involving the trust. (See *Estate of Janice L. Taubman* (Sept. 15, 2004, B170510) [nonpub.opn.]; *Taubman v. U.S. Bank* (Oct. 24, 2007, B177712, B185170) [nonpub.opn.]; *Taubman v. Taubman* (June 18, 2008, B194074) [nonpub.opn]; *Budget Finance Company v. U.S. Bank, N.A.* (Apr. 30, 2013, B238907) [nonpub. opn.]; *Lambert v. U.S. Bank, N.A.* (Sept. 23, 2013, B240359) [nonpub. opn.].) Our description of the factual and procedural history borrows from our prior opinions when necessary for historical context but otherwise focuses on the pleadings and hearing relating to the trustee's amended second and final accounting, which is the subject of the instant appeal.

that subtrust net income was to be distributed to Richard in monthly or other convenient installments along with any additional funds the trustee deemed necessary in its discretion for the health and education of Richard and his son. The trust also required the trustee to pay out of the principal of Richard's share, in monthly or other convenient installments, any sums he requested not exceeding an aggregate annual sum of $100,000. Under the trust's distribution schedule any remaining balance of the subtrust was to be distributed to Richard 10 years after Janice's death.

Janice declared in the trust instrument her intent to divide the trust assets equally between Anne and Richard. To effectuate this intent, the trust expressly provided for an equalizing payment, if necessary, at the time of final distribution of trust assets.

2. *The January 28, 2011 Final Judgment and Decree Modifying the Trust*

Following Janice's death, the trust became the subject of contentious litigation between Anne and Richard. On January 28, 2011, after an extensive evidentiary hearing, the trial court issued a final judgment and decree resolving several outstanding issues between them. In particular, the court found Richard had been overpaid by nearly $6 million during the term of the trust through no fault of the trustee. The court also found, in light of actions taken by Anne that resulted in the transfer of Seaport Village trust assets to another entity she controlled, modification of the trust was necessary to effectuate Janice's intent that Richard and Anne receive an equal distribution of trust assets. To this end, the court terminated the two subtrusts and directed the trustee to make an in-kind distribution of all trust assets (except for the Seaport Village assets) to Anne; Seaport Village assets were to be divided in-kind evenly between Anne and Richard, subject to the amounts Richard owed Anne, which would, until paid, constitute an equitable lien in favor of Anne on Richard's prorata interest in the Seaport Village trust assets; and Richard was to receive a credit against the debt secured by the equitable lien in the amount of one-half of the current fair market value of the oil and gas interests held by the trust. The court declined Anne's request to terminate the trust and discharge the trustee, explaining that such a ruling would have to await an amended final

3

accounting to take into consideration, among other things, the fair market value of the oil and gas interests.[3]

3. *Anne's Petition for Instructions to the Trustee*

On March 21, 2011 Anne filed a petition for instructions to the trustee regarding payment of the trustee's attorney fees from the trusts. She also requested the court instruct the trustee on the proper valuation for assessing the fair market value of the oil and gas interests. Insisting there was no identifiable market for purchasing those fractional interests, she urged the court to instruct the trustee to use the valuation stated in the federal and state tax returns filed on behalf of Janice's Taubman's estate in 2000: $1,248,530—an amount based on the appraisal commissioned by the estate and provided by petroleum engineers Crowell and Crowell in 1999. Anne attached to her petition both the tax returns and the Crowell and Crowell appraisal.

In its response to the petition the trustee asserted Anne's valuation suggestions were premature and should await the trustee's amended final accounting. On May 5, 2011 Anne filed a supplemental memorandum urging the oil and gas interests be valued at twice the annual royalties of those interests. Anne stated "in the past twelve months the Trust's gross royalties of the oil and gas interests administered by the Bank of Oklahoma" was "approximately $630,000," yielding, under her suggested valuation methodology, a fair market value of $1,260,000.

On May 13, 2011 Anne and the trustee entered into a settlement agreement regarding payment of attorney fees from trust assets, which the court approved. The court observed the only issue remaining was valuation of the oil and gas interests and instructed the trustee to provide a final accounting that included a fair market valuation of

---

[3] The oil and gas interests consisted of "royalty interests, working interests [interest in oil wells and producing facilities] and minerals in place not currently being extracted" in properties located in Arkansas, Illinois, Kansas, Kentucky, Louisiana, North Dakota, New Mexico Oklahoma and Texas. The interests were owned through either the Taubman Family Trust or the Buffalo Oil Company, Inc. Liquidating Trust, which in turn owned interests in the mineral leases.

those properties.  Anne and Richard could file any objections they might have once the accounting was provided.

    4. *The Trustee's Amended Second and Final Accounting*

On June 17, 2011 the trustee filed an amended second and final account and report of trustee and petition for approval of the valuation of the oil and gas interests.  The trustee explained it had engaged Gordon Romine, a registered professional petroleum engineer and president of the petroleum consulting firm Lee Keeling and Associates, to conduct the appraisal of the oil and gas interests.  The trustee informed the court it would provide Romine's valuation on or before July 15, 2011.[4]

On July 21, 2011 the trustee filed its petition for approval of amended second and final account, appraising the fair market value of the oil and gas interests, as of June 1, 2011, at $4,450,908.  The trustee attached to its pleading a seven-page summary of the Lee Keeling and Associates appraisal, as well as 205 pages of charts, schedules and other documentation supporting the valuation.

---

[4]    The trustee summarized its reasons for engaging an expert to provide a comprehensive market analysis, noting Anne's and Richard's conflicting interests in the valuation:  "In order to properly value the Trust's Oil and Gas Interests, the Trustee has chosen to engage an oil and gas professional to value these interests because it believes that a more informal method, such as an informal survey of the industry's use of multiples of 'trailing cash flow' will not provide the certainty which this Court needs to satisfy the adverse interests of the beneficiaries, Ric[hard] and Anne, in valuing these assets.  It is clear that Ric[hard]'s interest is in a high value for the Oil and Gas Interests while Anne's interest is in a lower value.  [This is true because a higher value reduces or eliminates the amount of Anne's lien on Richard's share of the Seaport Village assets; conversely a lower valuation benefits Anne.]  No informal survey will be satisfactory to either of them and the controversies which have plagued this Trust for the last 11 years will only resurface.  Moreover, this Court needs to be guided by a professional valuation in order to approve the Trustee's accounting and to relieve the Trustee from further responsibility for the valuation of these assets.  The professional appraisal of the mineral interests and the Court's approval of the accounting setting forth said values will provide fairness both to Ric[hard] and Anne in connection with what Anne is deemed to have received from the Trust pursuant to the January 28 Judgment and what Ric[hard] is deemed to have received by virtue of a partial satisfaction of the Equitable Lien imposed on [his] share."

5

On September 8, 2011 Anne filed a preliminary response to the trustee's petition for approval of the amended second and final accounting, reiterating her position that the proper methodology was to value the interests at twice their annual earnings, resulting in a value of $1.2 million. Alternatively, she argued, Romine's methodology improperly relied on a speculative futures market and failed to take into account the temporary spike in oil prices in June 2011 caused by unrest in Libya and other oil-producing countries in the Middle East. If a multiple of gross annual earnings was an inappropriate valuation basis, she contended, a more appropriate methodology would be to use an average of the historic closing prices for oil and gas interests over the life of the trust. Using this methodology, the oil and gas interests were worth $2.32 million at most. Anne attached as an exhibit to her response documentation purporting to show the spot-prices for oil on January 29, 2011 (the date of the judgment) and June 1, 2011 (the valuation date used in the appraisal).

Although Richard maintained the oil and gas assets were actually worth $10 million, he did not object to the fair market valuation of the oil and gas interests adopted by the trustee in its amended second and final accounting.

4. *The Evidentiary Hearing on the Trustee's Valuation*

On November 30, 2011 the court vacated submission of the matter, stating it intended to accept oral testimony in support of the accounting and petition and in support of Anne's objections to it. At the evidentiary hearing, which began on March 2, 2012 and continued on March 20, 2012, Romine testified in support of his company's appraisal. Romine described his background and experience, stating he had conducted more than 1,000 appraisals of similar properties in his career. As for his methodology, Romine explained he established a price valuation by using 36-month strips of futures contracts quoted on the New York Mercantile Exchange (NYMEX Strips). According to Romine, futures contracts were the closest publicly-traded reference point for oil and gas reserves to be produced in the future and thus were widely used in the industry to value these types of interests. He used a June 1, 2011 valuation date because it was the closest

6

date to the May 16, 2011 distribution of in-kind oil and gas interests to Anne. He also used a discount rate of 10 percent to account for inflation.

Anne did not introduce any additional evidence. However, she vigorously cross-examined Romine, challenging his assumptions and insisting his methodology was flawed. In addition to Romine's use of a futures market rather than closing or spot-prices and, by Romine's own admission, an arbitrary 50-year time-line for future oil production from the properties, she argued the appraisal incorrectly failed to include any discount for the fractional and indirect nature of the ownership interest in the properties. Anne did not provide evidence as to the proper discount factor but insisted some discount was warranted to take into account the fractional nature of the interests and its effect on the property's marketability. The court echoed this last concern: "I believe I asked [Romine] this question and he responded in a way which led me to believe he was not taking into account whatever discount is appropriately given to the fact that ownership of that oil and gas is indirect. It is not ownership of the oil and gas, but is ownership in Taubman Trust or Buffalo Oil."[5] After arguments concluded, the court took the matter under submission.

5. *The Court's Order*

On June 15, 2012, the court issued its order approving the accounting in part and disapproving the accounting in part. The court found the oil and gas interests had a fair market value of $3,894,544.50, a reduction of 12.5 percent from Romine's valuation. "To the extent the Trustee's methodology resulted in a greater value, it is disapproved [and] Anne Taubman's objection to the Trustee's valuation is sustained." The court

---

[5] The court stated, "One of the problems is there is no control over Buffalo Oil or the Taubman interest [in the oil and gas]. The Internal Revenue Service, as I understand it, routinely discounts for lack of control. Do you know anything about that?" The trustee replied that, in his experience, the fair market value of the estate for estate tax purposes is usually reduced by 20 to 35 percent to reflect the indirect nature of the ownership interests, but could not cite a code section or other authority for that discount percentage.

7

reserved for future proceedings the amount to be credited against the equitable lien and the calculation of interest. No objection to the court's order or request for a statement of decision was made by any party.

## DISCUSSION

1. *Standard of Review*

The probate court's factual findings following a hearing on a contested accounting are reviewed for substantial evidence. (*Estate of Fain* (1999) 75 Cal.App.4th 973, 991; *Manson v. Shepherd* (2010) 188 Cal.App.4th 1244, 1264.) We view the record in the light most favorable to the prevailing party and resolve all conflicts and give the benefit of all reasonable inferences in support of the judgment. (See *Axis Surplus Ins. Co. v. Reinoso* (2012) 208 Cal.App.4th 181, 189; *ASP Properties Group, L.P., v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.) We do not evaluate the credibility of the witnesses or otherwise reweigh the evidence. (See *Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514-515.)

2. *The Court's Valuation Finding Is Supported by Substantial Evidence*

Richard contends the court's factual finding concerning the fair market value of the oil and gas interests is not supported by substantial evidence.[6] Insisting Romine's appraisal and supporting testimony provided the only evidence on this issue, Richard asserts the court was required to adopt his $4,450,908 valuation. No other valuation, discount or deviation from that amount, he submits, was supported by the evidence or legally justified.

Contrary to Richard's contention, there is no requirement that the trier of fact accept the testimony of the sole expert witness. As with any other witness, the court here could rely upon all, part or none of Romine's testimony when finding the fair market

---

[6]    In addition to challenging the court's June 15, 2012 order, Richard's opening brief also challenges several aspects of the court's January 2011 and May 2011 orders. On November 4, 2013 we dismissed Richard's purported appeal from those orders as untimely.

value of the oil and gas interests: "It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. [Citations.] . . . '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.'" (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68; see *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1322, fn. 19 ["[a]s long as it does not do so arbitrarily," other than in professional negligence cases "a jury may entirely reject the testimony of one party's expert witness even when the other party does not call any opposing expert and the expert testimony is not contradicted"]; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 ["[s]o long as it does not do so arbitrarily, a jury may entirely reject the testimony of a plaintiff's expert, even where the defendant does not call any opposing expert and the expert testimony is not contradicted"]; see generally CACI No. 219 ["[I]t is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's testimony. . . ."].)

Moreover, Richard's characterization of the record is flawed. In addition to Romine's testimony, the court had previously received Anne's written objections to Romine's methodology, as well as her own evidence of the value of the oil and gas interests, including the Crowell appraisal and the estate tax returns reflecting a valuation of $1.2 million in 2000 based on a methodology using multiples of cash flow rather than a futures market.[7] Moreover, in both her opposition papers and at the hearing Anne vigorously challenged several of Romine's preliminary assumptions for his calculations, including (1) Romine's use of a future's market rather than spot-prices or cash flow;

---

[7] Anne also submitted documents purportedly from government sources identifying closing prices of oil and gas in April and June 2011. However, the court denied Anne's request for judicial notice of that information, and we do not consider those documents as part of the record.

9

(2) Romine's selection of a 50-year estimate of the productive life of the oil and gas interests; (3) the 10 percent present-value discount rate Romine applied to account for inflation; (4) the date of valuation; and (5) the failure to recognize the fractional nature of the interests being valued.

The court sustained Anne's objections to the extent the appraised value exceeded $3,894,544.50; no statement of decision or clarification as to which objections were sustained was requested. Inferring, as we must, all factual findings in support of the judgment, the court's valuation, well within the range of the valuations presented and argued, is supported by substantial evidence. (See *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1275 ["Although there was no testimony or other evidence as to the specific value of $12,500 found by the trial court, there was conflicting evidence not only on the value of individual guns, but also as to how many guns were community property. We must follow the doctrine of implied findings, which applies because no statement of decision was requested. There certainly was evidence from which the court could have arrived at its independent determination of $12,500 as the value of the community property interest in the gun collection. Thus substantial evidence supports the trial court's valuation."]; see also *Copley v. Copley* (1981) 126 Cal.App.3d 248, 275-276 ["There was substantial evidence of a wide range of valuation figures from which it was reasonable for the trial court as trier of fact to infer $58 was the May 21, 1975 [per share stock] value. Accordingly, we deem this factual matter sufficiently established and supported by the findings"]; *Gilroy v. Filice* (1963) 221 Cal.App.2d 259, 273.)

## DISPOSITION

The June 15, 2012 order is affirmed. Anne Taubman and U.S. Bank, as trustee are to recover their costs on appeal.


PERLUSS, P. J.

We concur:

WOODS, J.                    ZELON, J.