Filed 9/1/20  IV Solutions v. Cal. Board of Pharmacy CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| IV SOLUTIONS, INC., et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>CALIFORNIA BOARD OF PHARMACY,<br><br>     Defendant and Respondent. | B281845<br><br>(Los Angeles County<br> Super. Ct. No. BS160527) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Amy D. Hogue, Judge.  Affirmed.

Wolf, Rifkin, Shapiro, Schulman & Rabkin, Jason M. Flom and Marc E. Rohatiner for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Carl W. Sonne, Assistant Attorney General, Shawn Paul Cook and Matthew A. King, Deputy Attorneys General, for Defendant and Respondent.

Following a lengthy administrative hearing, respondent California Board of Pharmacy (the Board) revoked the pharmacy license issued to appellant IV Solutions, Inc. (IVS), and ordered that IVS and its president, Alireza Varastehpour, also known as Alex Vara (we will refer to him as Vara; we refer to IVS and Vara together as IVS/Vara), are prohibited from serving as a manager, administrator, owner, member, officer, director, associate, or partner of a licensee of the Board. IVS/Vara filed in the superior court a petition for writ of administrative mandamus. Finding the weight of the evidence supported the Board's findings and that the Board did not abuse its discretion in imposing the penalty, the superior court denied the petition. IVS/Vara appeal, arguing that (1) the Board applied an incorrect standard of proof; (2) certain findings of the Board were not supported by the weight of the evidence; and (3) the Board abused its discretion by imposing the most severe penalty. None of these arguments have merit. Accordingly, we affirm the judgment.

## BACKGROUND

IVS is a closed-door clinical pharmacy that provides home infusion therapy to patients.[1] Vara, who has a background in marketing and business development for healthcare-related companies, created IVS and is its president and sole owner. The Board issued a pharmacy permit to IVS, with Vara as president, in 2002.

---

[1] A closed-door pharmacy is a pharmacy that provides products and services only to its select clients, and is not open to the general public.

As part of its business, IVS compounds sterile injectable products. At the time of the events at issue here, a pharmacy that did sterile compounding was required to either have a sterile compounding permit issued by the Board or be accredited by a Board-approved accrediting agency. IVS performed sterile compounding under an accreditation from the Joint Commission on Accreditation of Healthcare Organizations (now known as the Joint Commission), a Board-approved agency.

During the relevant time, IVS employed 15 to 20 people. Vara, who is not a pharmacist, was in charge of business development, and Marlene Casillas, the chief operating officer, was in charge of human resources, billing, and business operations (although the evidence showed that Vara often made decisions regarding IVS's business operations). The "Pharmacist In Charge" (PIC) was in charge of prescriptions and the clinical aspects of the pharmacy. At least 12 different people served as PIC between 2002 and 2014. From February 2009 until March 2012, the PIC was Renee Sadow, who was a party to the administrative proceeding at issue here but is not a party to this appeal.

A.    *Initial Complaint, Investigation, and Accusation*

In February 2008, the Board received a complaint from IVS's former PIC, who had left his employment with IVS after a disagreement with Vara regarding the acquisition of the prescription medication Lovenox. Two Board investigators investigated the complaint. During the course of that investigation they discovered, among other things,

that (1) Vara had a key to the pharmacy (as opposed to the business office) in his possession;[2] (2) IVS staff had been using the name "Stat Clinical Pharmacy" on documentation relating to several patients;[3] (3) Vara had obtained Lovenox from a company in Canada that was not licensed to sell wholesale prescription medications in California; and (4) some vials of Lovenox, which Vara had obtained from a different unlicensed wholesaler, had been shipped to Vara's father's home, i.e., an unlicensed facility.

The Board filed an accusation against IVS, with Vara as its president, alleging eight causes for discipline related to the above discoveries and other issues discovered during the inspection of IVS's records.

B. *Patient Complaints and Amended Accusations*

While the former PIC's complaint was being investigated, and after the initial accusation was filed, the Board received additional complaints related to several of IVS's patients.

1. *Patient D.K.*

In April 2010, patient D.K. was prescribed a six-week regimen of an antibiotic to be administered intravenously 24 hours a day, with a

---

[2]     As a non-pharmacist, Vara was not permitted to have a key to the pharmacy. The key was required to be kept in a sealed envelope signed by the pharmacist who last used it, and the pharmacy could not be opened without a pharmacist present.

[3]     No permit had been issued to operate a pharmacy under that name.

specific dosage delivered every six hours by a prism infusion pump. Sadow, IVS's PIC, filled the prescription and programmed a Curlin 4000 CMS pump—an ambulatory infusion pump that may be obtained only by prescription from a licensed practitioner—to provide the required doses. IVS delivered the pump, medication, and supplies to D.K.

IVS contracted with another company to provide a nurse to set up the pump, start the intravenous line, and show D.K. and his family how to change the IV bags of medication. The first nurse visited D.K. every day for the first few days, and then was replaced by a different nurse.

On the eighth day of D.K.'s therapy, which was a Friday, that replacement nurse started a new IV bag early in the afternoon. That evening, after the nurse had left, the alarm on the pump went off and would not stop, so members of D.K.'s family called the nursing company. The supervisor of the nursing company, who was unable to reach the nurse assigned to D.K., spoke with D.K.'s family members that night, but was unable to resolve the issue.

When D.K.'s son-in-law, Kevin G., checked in on D.K. at around 11:00 p.m. that night, the IV bag appeared to be full. When Kevin checked on D.K. early the next morning, the IV bag was empty. Because he believed the IV bag had been changed less than 12 hours before, Kevin was afraid that D.K. had received the full 24-hour cycle of the medication in much less than 24 hours. Kevin tried to call the nurse assigned to D.K., but was not able to reach her, so he called his mother, Donna G. (who is a registered nurse), who came and checked on D.K.

In the meantime, the nursing company contacted IVS at 4:49 a.m. that morning. At 4:50 a.m., PIC Sadow received a call from IVS's answering service, telling her that a member of D.K.'s family had called requesting a nurse. Sadow was on vacation, and had received permission from Vara and Casillas to have Jeannie Kim be the on-call pharmacist while she was away. Therefore, Sadow told the answering service to contact the pharmacist on call, i.e., Kim.

At 8:57 a.m., Sadow called Vara to tell him about the call she had received; she confirmed that she was away for the weekend and that Jeanie Kim was the pharmacist on call. She told Vara that either Kim or the nurse assigned to D.K. should be involved in the situation. Over the course of the morning and early afternoon, Kevin and Donna called IVS and spoke to Vara several times, complaining about the pump and asking for a new one. Vara repeatedly told them there was nothing wrong with the pump and blamed the assigned nurse for the problem they were experiencing. When Donna asked to speak to a pharmacist, Vara told her that he was the owner of the pharmacy and was the appropriate person to deal with the situation. During some of Vara's conversations with Kevin and Donna, Vara cursed at them and hung up on them.[4]

Eventually, after speaking with a technician from the pump manufacturer, Vara concluded that there was nothing wrong with the pump, and that the nurse assigned to D.K. had done something that

---

[4]     For example, Vara told Kevin to "go fuck yourself and hire an attorney," and told Donna, "I don't give a shit."

caused the problem. He arranged for a different nurse (D.K.'s first nurse, who had done the original set up) to go to D.K.'s home to try to fix the problem. That nurse arrived at 6:00 p.m. that evening and, after speaking with a technician from the manufacturer, was able to reprogram the pump.

Although the pump subsequently worked without incident, D.K.'s family decided to take him off the IV regimen due to the problems they encountered. They also filed a complaint with the Board about IVS/Vara. During the investigation of that complaint, the Board investigator obtained documents from IVS that showed that, on more than one occasion, IVS used prescription labels identifying the pharmacy as "IV Solutions Clinical Pharmacy," even though it was not licensed to do business under that name.

### 2. *First Amended Accusation*

Following the investigation of D.K.'s family's complaint, the Board filed a first amended accusation. The amended accusation added PIC Sadow as a respondent[5] and added nine causes for discipline (for a total of 17 causes). Three of the added causes related to allegations that Vara performed duties of a pharmacist (or represented himself as a pharmacist) without being licensed as a pharmacist when he dealt with the problem involving the prescription-required Curlin pump. One

---

[5]     Because Sadow is not a party to this appeal, our discussion will not address any allegations or findings made as to her unless necessary for context.

7

added cause was based upon IVS's use of "IV Solutions Clinical Pharmacy" on some labels. The remaining additional causes also related to issues arising from the services provided to D.K. and/or the investigation of his family's complaint.

3. *Patient C.R.*

Patient C.R. was scheduled to have foot surgery. In anticipation of the surgery, her surgeon prescribed antibiotics and morphine, to be administered by an infusion pump, after C.R. was released from the hospital following the surgery; the surgeon requested that IVS provide the home infusion services. IVS determined it would use a Curlin pump similar to the one used with patient D.K.

IVS contracted with Care South Home Health Service (Care South) to provide nursing services in connection with the infusion. Stephanie Phillips, a Care South manager, previously had asked IVS to provide training to Care South nurses on how to use the Curlin pump, because the nurses were not familiar with it. Although IVS has written policies and procedures that it will provide staff that is properly trained and competent to set up home medical equipment and to instruct the patient and/or caregiver on its use, Vara refused Phillips's request. Instead, Vara gave Care South a DVD from the manufacturer that demonstrated how to use the pump.

The medications, equipment, and supplies prescribed for C.R. were delivered to her home before the surgery. The morning C.R. was released from the hospital, a nurse from Care South arrived at C.R.'s house, set up the infusion equipment, and started the antibiotic

therapy. C.R., who had been administered pain medication at the hospital, told the nurse that she was not in pain, so she did not need any morphine right then.

Early the next morning, which was a Saturday, C.R. began experiencing increasing pain in her foot. When the Care South nurse (a different nurse than the one who had set up the equipment the day before) arrived at 9:00 a.m., C.R. asked her to give her morphine. The nurse, who had been instructed to, and did, view the DVD from the Curlin pump manufacturer the day before, began to set up the morphine IV. Before starting to administer the drug, however, she told C.R. that she needed to check on something because she was not familiar with the Curlin pump. The nurse tried to call IVS, using all of the telephone numbers she had for it, but no one answered.[6] C.R. and her husband also tried several times to call IVS at the phone number provided to them, but they were unable to speak to anyone or leave a message. The nurse then called her manager, Phillips, who also tried to call IVS at all the phone numbers she had for it, but no one answered her calls. As a result of everyone's inability to reach anyone at IVS, C.R. had to forego the IV morphine and instead took oral pain medication.

---

[6] IVS has a written policy that at least one pharmacist will be available at all times. IVS's procedures require that an employee be responsible for forwarding calls to an answering service at the end of each business day, and that the person on call after close of business check the answering service for messages periodically.

Phillips continued to try to call IVS, and finally reached Vara two days later (on Monday). When Phillips told him about being unable to reach anyone, Vara told him that IVS's phone had been out all weekend, and that he was unaware of it until he arrived at the office that day. The following day (Tuesday), C.R. called IVS and said she wanted to speak with someone in charge. Vara got on the phone, and C.R. told him what had happened on Saturday, and how no one could reach anyone at IVS; Vara did not believe her, and implied that she was lying.

After C.R. was finished with her antibiotic treatment, IVS came and picked up its equipment. C.R. still had the full bag of morphine, so IVS took that as well. She asked IVS for a refund for the cost of the morphine she returned to IVS because she was unable to use it, but she received no response. She subsequently received a billing invoice from IVS that seemed to indicate that IVS had billed her for three bags of morphine even though it had delivered only one bag to her, which she had not been able to use.

C.R. submitted a complaint to the Board. The investigator assigned to the complaint obtained the records from IVS's answering service, which showed no calls were received on the Saturday in question, and that the service did not begin receiving calls until 10:00 a.m. on the following day. The investigator concluded that IVS's staff forgot to transfer the phone system to the answering service when IVS closed its office on that Friday evening.

In the course of her investigation of the incident, the Board investigator discovered that from around January 2009 to January

2012, IVS had on at least 38 occasions obtained Curlin Medical 4000 CMS pumps from a wholesaler not licensed to sell or rent such devices in California.[7] That wholesaler, Ardus Medical (Ardus), was based in Ohio, where it was not required to have a license to supply Curlin pumps to persons or entities in that state. Neither Ardus nor IVS staff were aware that a license was required under California law.

4. *Patient J.M.*

J.M. was diagnosed with Hepatitis C in 2009. His physician prescribed an IV regimen of several drugs, to be administered for a year, to try to keep J.M. from having to have a liver transplant. The physician referred J.M.'s IV treatment to IVS even though IVS was not in J.M.'s insurer's network of providers. Neither the physician nor IVS told J.M. or his wife that IVS was out of network. Nor did IVS tell J.M. or his wife, before services were rendered, what the cost of care, anticipated charges to J.M., or co-insurance amount would be.

IVS delivered the first round of supplies and medications on November 6, 2009. Sometime before January 29, 2010, IVS billed J.M.'s health insurer for the treatments provided from November 7, 2009 through January 4, 2010. The insurer issued to J.M. an explanation of benefit payments (EOB) on January 29, 2010, showing that IVS billed $14,922 during that time period, and that the insurer agreed to pay

---

[7] IVS was not permitted to purchase or lease any device designated as dangerous, such as the Curlin pump, from a person or entity not licensed with the Board as a wholesaler or pharmacy. (Bus. & Prof. Code, § 4169, subd. (a)(1).)

11

only $21.67. Alarmed, J.M. called IVS. She talked to an employee who told her there had been a "coding error" and that it would be fixed. She did not receive any bills from IVS or EOBs after that until January 2011.

J.M. continued to receive treatments from IVS through September 2010; he had to discontinue treatment at that time due to side effects of the medication. IVS did not send bills to J.M.'s insurer for those treatments until January 2011; J.M. received the EOBs related to those bills in late January and early February 2011. Those EOBs showed that IVS had billed the insurer more than $2 million for J.M.'s treatment. Along with the EOBs, the insurer sent reimbursement checks, payable to J.M.'s wife, totaling approximately $900,000, i.e., the amount the insurer agreed to pay on the $2 million of claims IVS submitted.

J.M.'s wife, who is an insurance investigator (for a different insurance company), believed the amounts IVS billed were excessive, so she conducted research into the average wholesale prices of the medications at issue and the amount that would be charged by an in-network retail pharmacy (Walgreens). She found that IVS charged $1,967,683 for medications for which Walgreens charges $62,599.60.

J.M.'s wife submitted complaints to her insurer and the Board. She also contacted IVS to complain about the excessive charges, and because she was worried that she (and/or her family) would be responsible for the $1.1 million in charges that were not covered by her insurance. The IVS staff to whom J.M.'s wife spoke told her that IVS would only seek payment from the insurer, and demanded that she sign

12

the $900,000 in checks she received over to IVS. J.M.'s wife told them that before she would do that, she wanted to see the itemized bills for the medications and services that were rendered to J.M. IVS's chief operating officer, Casillas, told her that IVS did not have itemized statements. Instead, Casillas offered to meet with her to go through the bills that IVS sent to the insurer and compare them to the EOBs. When J.M.'s wife continued to demand itemized bills and refused to turn over the checks, IVS filed a civil lawsuit against her and J.M., seeking more than $2 million.[8]

5.     *Patient R.M.*

R.M. had a series of serious problems with his knees beginning in 2003, many of which resulted in infections that required IV antibiotic treatment. With respect to one of those treatments, in 2008, the pharmacy that supplied the medication billed R.M.'s insurer $20,000, and with respect to another, in 2009, the pharmacy billed the insurer $18,000; both were six-week treatments. In each case, the antibiotic treatments were provided by pharmacies within R.M.'s health insurance company's network.

In 2011, R.M. had another infection after a procedure on his knee, and his physician ordered a five week IV antibiotic treatment. The physician referred R.M. to IVS for the treatment. IVS was not an in-

---

[8]     The parties ultimately submitted the dispute to arbitration and settled their claims, with J.M. paying IVS $710,000, and the rest of the insurance proceeds going to pay J.M.'s and his wife's attorney fees.

network provider for R.M., and neither R.M.'s physician nor IVS told R.M. that IVS was out of network. IVS also did not disclose to R.M. before the treatment started (or at any time thereafter) the cost of the treatment, the anticipated charges to him, or his co-payment.

IVS provided the IV antibiotics to R.M. from April 22, 2011 to May 28, 2011. It billed R.M.'s insurer $12,755 for each day's medication, for a total of $471,935. The cost to IVS for the medication given to R.M. was less than $200 per day, for a total cost of less than $7,000 for the entire five weeks of treatment. IVS did not begin to submit bills for the treatment to R.M.'s insurer until at least May 25, 2011, when the treatment was almost completed; the insurer did not issue EOBs until late June 2011.

Although R.M.'s insurer paid almost all of the amounts IVS billed, R.M. was upset when he saw the EOBs. He believed IVS had committed fraud, and he would have stopped treatment with IVS and gone to a different provider had he seen the EOBs earlier. He contacted the fraud department of his insurer and various news media organizations, and ultimately filed a complaint with the Board.

6. *Second and Third Amended Accusations*

The Board filed a second amended accusation that added four causes for discipline arising from the investigations of C.R.'s, J.M.'s, and R.M.'s complaints. The first additional cause alleged that IVS/Vara engaged in unprofessional and deceptive conduct by failing to inform J.M. and R.M. that IVS was an out-of-network provider, failing to inform them of the cost of treatment, and by delaying billing the

14

patients' insurers until the end of their treatments. The second additional cause alleged that IVS/Vara obtained dangerous devices (Curlin pumps) from an unlicensed wholesaler. The third additional cause alleged that IVS/Vara failed to have consultation available to C.R. regarding the Curlin pump, and the last additional cause alleged that IVS/Vara created a false document by issuing a receipt stating that IVS delivered three bags of morphine to C.R. when only one had been delivered.

During the administrative hearing, the Board filed a third amended accusation in which certain allegations (not relevant to this appeal) were deleted, but the causes and all other allegations remained unchanged.

C.    *Administrative Hearing and Findings of Administrative Law Judge*

The administrative hearing was held over 23 days, beginning on July 8, 2014 and ending on September 18, 2014. On March 5, 2015, the administrative law judge (ALJ) issued a proposed decision with extensive factual findings and legal conclusions. In the legal conclusions portion of the proposed decision, the ALJ began with a discussion of the applicable standards of proof. The ALJ concluded that a governing agency seeking disciplinary action against a professional license was required to establish cause for discipline by clear and convincing evidence (citing *Ettinger v. Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 857), but that only a preponderance of the evidence is required to establish a cause for

15

discipline against a nonprofessional license (citing *Imports Performance v. Department of Consumer Affairs, Bureau of Automotive Repair* (2011) 201 Cal.App.4th 911, 916-917; *San Benito Foods v. Veneman* (1996) 50 Cal.App.4th 1889). The ALJ concluded that the clear and convincing evidence standard applied to PIC Sadow because she possessed a professional license, i.e., one that requires extensive education, training, and testing requirements. However, the ALJ concluded that IVS/Vara had a nonprofessional license—based upon undisputed evidence that anyone meeting certain basic criteria is able to obtain a pharmacy permit[9]—and therefore the lower preponderance of the evidence standard applied to IVS/Vara. Despite these conclusions, the ALJ clarified that all factual findings, "including any factual findings involving Respondent IV Solutions and/or Mr. Vara but not Respondent Sadow," were established by clear and convincing evidence, except where expressly stated to have been established by a preponderance of the evidence.

Turning to the allegations of the accusation, the ALJ found the Board had established 12 of the 19 alleged causes for discipline against IVS (and Vara as president),[10] as follows:

---

[9] The ALF observed that an inspector for the Board credibly testified that an applicant for a pharmacy permit needs only to complete a financial affidavit and attest that he or she has not been convicted of a felony or misdemeanor related to drugs, and has not been arrested for driving under the influence of alcohol; there are no educational requirements, and no testing or expertise is required.

[10] Although there were 21 causes for discipline alleged in the third amended accusation, one (the 11th cause) was alleged only against PIC

16

- First cause for discipline: *Moral turpitude, dishonesty, fraud, deceit, or corruption.* The ALJ found the Board established by a preponderance of the evidence that IVS "intentionally acted in a deceitful manner as to patients J.M. and R.M. by concealing information from them that it had a duty to provide"—i.e., IVS failed to disclose the cost of the treatments and services at the outset, as required by IVS's written policies, and intentionally delayed billing J.M.'s insurer so as not to alert him or his wife of the charges—and that IVS's conduct was motivated by a desire to maximize charges to the patients' insurers. The ALJ concluded that this conduct subjected IVS to disciplinary action under Business and Professions Code[11] section 4301, subdivision (f).

- Second cause for discipline. *Obtaining a dangerous device from an unlicensed wholesaler.* The ALJ found by clear and convincing evidence that IVS/Vara violated section 4169, subdivision (a)(1) by obtaining Curlin 4000 CMS pumps from an unlicensed wholesaler. The ALJ found that as a result of this violation, IVS/Vara are subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j), (o), and (p).

- Third cause for discipline. *Performing the duties of a pharmacist without a license.* The ALJ found that Vara, a non-pharmacist,

Sadow, and another (the 13th cause) was withdrawn at the hearing. The ALJ found that the 5th, 8th, 9th, 10th, 18th, 19th, and 20th causes for discipline were not established.

[11] Further undesignated statutory references are to the Business and Professions Code.

17

performed the duties of a registered pharmacist by responding to calls from members of D.K.'s family regarding the prescription Curlin pump IVS had provided, and making the decision, without the involvement of a licensed pharmacist, not to replace the pump. The ALJ concluded, based on this conduct, that IVS/Vara was subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j), (o), and (p) for violating California Code of Regulations, title 16, section 1793.1, subdivision (b).

- Fourth cause for discipline. *Performing the duties of a pharmacist without a license.* Based upon the same facts as found in connection with the third cause for discipline, the ALJ found that IVS/Vara was subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (f), (j), (o), and (p) for violating California Code of Regulations, title 16, section 1793.1, subdivision (g).

- Sixth cause for discipline. *False and misleading label on prescription.* The ALJ found by clear and convincing evidence that IVS is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (f), (j), (o), and (p) for violating section 4078, subdivision (a)(1), and section 4076, subdivision (a)(6), by using prescription labels on certain prescriptions that falsely represented the name of the pharmacy as "IV Solutions Clinical Pharmacy."

- Seventh cause for discipline. *Records of dangerous drugs and devices kept open for inspection.* The ALJ found by clear and

18

convincing evidence that IVS is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j), (o), and (p) for violating section 4081, subdivisions (a) and (b) by failing to provide a certain requested document to a Board inspector.

- Twelfth cause for discipline. *Failure to have consultation available.* The ALJ found that IVS violated California Code of Regulations, title 16, section 1751.6, subdivision (a) by not being available for consultation with C.R. or her nurse regarding the use of the Curlin pump, which prevented C.R. from receiving the morphine she was prescribed. For this reason, the ALJ concluded that IVS is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j), (o), and (p).

- Fourteenth cause for discipline. *Making of false documents.* The ALJ found that IVS/Vara are subject to disciplinary action under section 4301, subdivisions (f) and (g) for falsely representing "Stat Clinical Pharmacy" as a licensed pharmacy when providing pharmacy services to approximately 25 patients, and creating and receiving documentation using that name.

- Fifteenth cause for discipline. *Violation of state law governing pharmacy/receiving and holding misbranded dangerous drugs.* The ALJ found that IVS violated Health and Safety Code section 111440 by importing vials of Lovenox, a dangerous drug, that were misbranded and restricted to sales in Canada. Therefore, the ALJ concluded that IVS is subject to disciplinary action for

unprofessional conduct under section 4301, subdivisions (i) and (o).

- Sixteenth cause for discipline. *Noncompliant ordering and delivery to an unlicensed facility.* The ALJ found that IVS violated section 4059.5, subdivision (a) by ordering Lovenox, a dangerous drug, from an unlicensed wholesaler in Canada and having it delivered to Vara's father's house, an unlicensed facility. This conduct rendered IVS subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j) and (o).

- Seventeenth cause for discipline. *Noncompliant Security.* The ALJ found that Vara was in personal possession of the pharmacy key on February 29, 2008, in violation of California Code of Regulations, title 16, section 1714, subdivisions (d) and (e). As a result, IVS is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j) and (o).

- Twenty-first cause for discipline. *Noncompliant refilling of controlled substance.* The ALJ found that IVS violated Health and Safety Code section 11200, subdivision (c), by refilling a Schedule II controlled substance, and therefore is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (j) and (o). (This violation was discovered when the pharmacy inspector reviewed IVS's records during his investigation of the complaint from the former PIC.)

Turning to the disposition, the ALJ considered the Board's "Disciplinary Guidelines [Rev. 10/2007]" (the Guidelines) as required by section 1760 of title 16 of the California Code of Regulations. Those Guidelines set forth four categories of violations (with corresponding ranges of discipline), with Category I as the least serious and Category IV as the most serious. The ALJ found there were two Category I violations (the 17th and 21st causes for discipline), two Category II violations (the 1st and 14th causes for discipline), three Category III violations (the 7th, 15th, and 16th causes for discipline), and five violations that could be classified as either Category II or III, depending on the circumstances (2nd, 3rd, 4th, 6th, and 12th causes for discipline). However, as directed by the Guidelines—which provide that where there are multiple violations in more than one category, the recommended discipline is the discipline recommended for the highest category—the ALJ treated "the totality of the violations" by IVS as Category III for the purpose of considering the range of recommended discipline.[12]

The ALJ next addressed the 15 factors listed in the Guidelines as factors to be considered in determining whether to impose the minimum, maximum, or some intermediate penalty. After addressing each of those factors, the ALJ concluded: "It is abundantly clear that Respondent IV Solutions was the moving force behind all of the

---

[12] The minimum recommended discipline for a single Category III violation is revocation, with revocation stayed, 90 days actual suspension, and three to five years probation. The maximum recommended discipline is revocation.

21

violations established in this case. Most of those violations were serious and intentional, the result of dishonesty, deceit or a conscious decision by Mr. Vara to exclude pharmacists from their required duties. Those violations subjected the public to the potential of harm and actually resulted in harm to some patients. While it is true that Respondent IV Solutions has no prior disciplinary record with the Board, it had only been licensed for about six years when it began engaging in misconduct and it had received three citations. Moreover, the violations established in this case were various, consistent and pervasive, spanning from 2008 through 2011 (about the time that the initial accusation was brought). Some mitigating facts were presented, mainly that Respondent IV Solutions cooperated with the Board's investigations and some of the violations were inadvertent. However, the mitigating facts are counter-balanced by aggravating facts, and substantially outweighed by the level of intentional and calculated misconduct. Most glaring is the absence of rehabilitation evidence. Given the breadth and span of the misconduct established, it was incumbent on Respondent IV Solutions to demonstrate some level of acceptance, contrition and dedication to preventing such misconduct in the future. The record is bereft of any hint that Mr. Vara believes he has done much if anything wrong and that similar misconduct in the future will be avoided. Finally, although the prices charged to J.M. and R.M. were not illegal or the basis for discipline, they certainly were unsavory. Since revocation is the maximum discipline recommended for a Category III violation, and Respondent IV Solutions has done little to show that the public will be

adequately protected by being placed on probation, revocation is warranted in this case."

The ALJ's proposed order therefore revoked IVS's pharmacy permit and ordered that IVS/Vara be prohibited from serving as a manager, administrator, owner, member, officer, director, associate, or partner of a Board Licensee.

### D.    *Decision of the Board*

The ALJ's proposed decision was submitted to the Board, which adopted it, to become effective on April 30, 2015.  On April 20, 2015, IVS requested a stay to allow it to file a petition for reconsideration. The Board granted the stay, and subsequently granted IVS's petition for reconsideration.

On reconsideration, the Board read and considered the entire record, including the parties' written submissions, as well as the transcript and exhibits from the administrative hearing.  The Board addressed IVS's assertion that the ALJ had applied an incorrect standard of proof, and that the clear and convincing evidence standard applied to IVS/Vara as well as Sadow.  The Board rejected this assertion, and found the ALJ properly found the preponderance of the evidence standard applied.  Nevertheless, the Board concluded, based upon its "close review of the record," that each cause of discipline was proven by clear and convincing evidence.  Accordingly, it modified certain findings and conclusions in the proposed decision (i.e., those findings and conclusions stating they were established by a preponderance of the evidence) to state they were established by clear

and convincing evidence. In doing so, the Board stated, "Respondent IV Solutions acted with repeated disregard for professional, ethical and honest practices. Reviewed collectively, the facts and circumstances of the misconduct are overwhelmingly persuasive."

Finally, the Board addressed the appropriateness of the proposed penalty. It observed that the Board is statutorily required to place protection of the public as its highest priority. (Citing § 4001.1.) Citing the harm caused by IVS/Vara's conduct with regard to C.R., J.M., and R.M., the Board stated that IVS, "especially through the conduct of Mr. Vara as its owner, has completely eroded the Board's confidence in its ability to lawfully operate a pharmacy," and that IVS's "violations demonstrate such a pattern of willful disregard for the laws pertaining to operating a pharmacy that [IVS] should no longer be able to do so."

The Board adopted the ALJ's proposed decision, as modified to state that all factual findings and legal conclusions were established by clear and convincing evidence.

E.     *Petition for Writ of Administrative Mandamus*
       1.     *The Petition and Motion for Writ*

IVS/Vara filed in the superior court a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5. In their memorandum of points and authorities in support of their motion for a peremptory writ, they argued that the ALJ and the Board applied an incorrect standard of proof, challenged the sustaining of the first, third, fourth, and sixth causes for discipline, and raised issues regarding the punishment the Board imposed.

24

Specifically, they argued that the Board failed to follow its precedent when it applied the preponderance of the evidence standard to the causes against IVS rather than the clear and convincing evidence standard. With regard to the first cause for discipline, they contended (1) the Board improperly based its decision on IVS's failure to follow its own voluntarily adopted internal policies (that it would disclose to the patient the expected costs of treatment prior to rendering services, etc.); and (2) there was no evidence that IVS intentionally delayed submitting its bills to J.M.'s insurer until after his treatment had been completed. With regard to the third and fourth causes for discipline, IVS/Vara asserted that neither the Board's findings nor the evidence supported the Board's conclusion that Vara performed the duties of a pharmacist. And they argued that the Board erred in sustaining the sixth cause for discipline because there was no evidence that IVS/Vara intended to deceive by using the name "IV Solutions Clinical Pharmacy" on some prescription labels.

Addressing the Board's selection of revocation as the punishment, IVS/Vara raised four issues. First, they argued that the Board committed clear legal error by considering evidence related to the prices IVS charged certain patients in determining the appropriate punishment, because the Board has no jurisdiction over drug prices. Second, they asserted the Board applied its Guidelines incorrectly by categorizing several violations as more severe than authorized by the Guidelines and treating all violations as Category III in determining the punishment. Third, they contended the Board erred in finding they had not submitted any evidence of rehabilitation in determining

punishment. Finally, they argued the Board incorrectly concluded that much of their conduct was knowing and intentional; they contend instead that most of the conduct was inadvertent and harmless.

2.    *Trial Court's Ruling*

The trial court found the weight of the evidence supported the Board's decision, and that the Board did not abuse its discretion in revoking IVS's license.

The court rejected the argument that the clear and convincing evidence standard of proof applied to the determination whether to revoke IVS's pharmacy permit. It agreed with the ALJ's analysis that, because a pharmacy permit does not require the applicant to complete extensive educational, training, and testing requirements, proceedings to suspend or revoke the permit do not require the higher standard of proof applicable to proceedings involving professional licenses. Accordingly, the court found that the ALJ properly applied the preponderance of the evidence standard.

The trial court also rejected IVS/Vara's challenge to the first cause for discipline. As discussed in more detail in section C.2.b. of the Discussion, *post*, the court found that the ALJ properly considered IVS's failure to follow its own policies because the court concluded that IVS's conduct—adopting those policies to obtain accreditation from the Joint Commission but then propounding different policies with lower standards after accreditation was obtained—falls within the broad range of section 4301, subdivision (f)'s definition of "unprofessional conduct." The court also set forth extensive evidence presented at the

26

administrative hearing from which the ALJ reasonably concluded that IVS delayed billing J.M.'s insurance company to avoid alerting J.M.'s wife to the amounts it was charging.

Similarly, and as discussed more fully in section C.3. of the Discussion, *post*, the trial court set forth the evidence presented at the administrative hearing regarding the conversations Vara had with D.K.'s family and caretakers regarding the problem with the Curlin pump (during which, the ALJ found, Vara improperly performed the duties of a pharmacist), and concluded the weight of the evidence supported the sustaining of the third and fourth causes for discipline.

The trial court also rejected IVS/Vara's challenge to the sustaining of the sixth cause for discipline. The court observed that there was no authority for IVS/Vara's assertion that the Board must find they intended to deceive by using the false name "IV Solutions Clinical Pharmacy." Instead, the court found that IVS's use of that unlicensed name was a statutory violation that is a cause for discipline under several subdivisions of section 4301, regardless of intent.

Of the four challenges IVS/Vara raised to the penalty imposed, the trial court agreed with one. The court agreed that the Board improperly characterized the second, third, fourth, sixth, and twelfth causes for discipline as Category II/III violations when they should have been characterized as Category II violations. However, the court found this was not grounds for remand because IVS/Vara had committed multiple violations, some of which were in Category III, so the Board properly considered the range of penalties recommended for Category III violations.

27

The trial court rejected IVS/Vara's remaining challenges. It found that the ALJ's consideration of IVS's prices in the context of understanding IVS's motives was appropriate. In also found that, contrary to IVS/Vara's assertion, the ALJ did consider evidence they point to as evidence of rehabilitation, but the court agreed with the ALJ's determination that there was little evidence that IVS was doing things differently or that Vara accepted responsibility for his misconduct. Finally, although the court acknowledged that some of the violations at issue might have been inadvertent, it found that many were "quite serious." It concluded that, viewed as a whole, the numerous violations found to have occurred "suggest either a disregard for or lack of knowledge about the laws regulating pharmacies." Therefore, the court found that the Board did not abuse its discretion in determining "that IVS's numerous violations and 'unscrupulous conduct' warranted revocation of its license."

The trial court denied the petition for writ of mandate, and entered judgment in favor of the Board. IVS/Vara timely filed a notice of appeal from the judgment.

## DISCUSSION

A. *Governing Law*

Pharmacies and pharmacists in California are governed by the Pharmacy Law (§§ 4000 et seq.), which includes provisions related to

28

licensing, practices allowed (or disallowed), and discipline.[13] Administration and enforcement of the Pharmacy Law is vested in the Board. (§ 4001, subd. (a).) As part of its administration of the Pharmacy Law, the Board has authority to adopt rules and regulations as necessary to protect the public. (§ 4005.) In exercising its licensing, regulatory, and disciplinary functions, "[p]rotection of the public shall be the [Board's] highest priority." (§ 4001.1.)

The Pharmacy Law provides that "[e]very license issued may be suspended or revoked" (§ 4300, subd. (a)), and requires the Board to "take action against any holder of a license who is guilty of unprofessional conduct" (§ 4301). Section 4301 lists several examples of unprofessional conduct, including:

- "The commission of any act involving moral turpitude, dishonesty, fraud, deceit, or corruption, whether the act is committed in the course of relations as a licensee or otherwise, and whether the act is a felony or misdemeanor or not." (§ 4301, subd. (f).)
- "Knowingly making or signing any certificate or other document that falsely represents the existence or nonexistence of a state of facts." (§ 4301, subd. (g).)

---

[13] "Pharmacy" is defined as an area, place, or premises licensed by the Board in which the profession of pharmacy is practiced. (§ 4037.) A "pharmacist" is defined as a natural person to whom a license has been issued by the Board in accordance with section 4200, who is entitled to practice pharmacy within or outside of a licensed pharmacy. (§ 4036.) Section 4200 lists the several requirements for a person to be licensed as a pharmacist, including educational requirements, practical experience, and testing requirements; there are no such requirements for obtaining a pharmacy license.

- "The violation of any of the statutes of this state, of any other state, or of the United States regulating controlled substances and dangerous drugs."  (§ 4301, subd. (j).)

- "Violating or attempting to violate, directly or indirectly, . . . any provision or term of this chapter or of the applicable federal and state laws and regulations governing pharmacy."  (§ 4301, subd. (o).)

- "Actions or conduct that would have warranted denial of a license."  (§ 4301, subd. (p).)

Proceedings to suspend or revoke a license issued by the Board must be conducted in an administrative adjudication in accordance with Government Code section 11500 et seq.  The Board's action resulting from that adjudication is subject to review by the superior court by means of a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5.  (§ 4300, subd. (e).)


B.      *Standards of Review Governing Petitions for Writ of Administrative Mandamus*

When a party files a petition for writ administrative mandamus challenging an adjudicatory decision, the inquiry by the trial court is limited "to the questions whether the [administrative agency] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the [administrative agency] has not proceeded in the manner required by law, the order or decision is not

30

supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (Code Civ. Proc., § 1094.5, subd. (c).)

When the administrative decision at issue affects a fundamental vested right made by an administrative agency—such as a decision to suspend or revoke an existing license, as in the present case—the trial court "'exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence.' [Citation.] But in doing so, 'a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' [Citation.]" (*Hoang v. California State Bd. of Pharmacy* (2014) 230 Cal.App.4th 448, 455.)

On appeal, even when the trial court is required to review the administrative decision under the independent judgment standard of review, we review the trial court's determination that the weight of the evidence supports the administrative decision under the substantial evidence standard of review. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 823 (*Fukuda*).) Where the trial court decides a question of

law, we exercise our independent judgment. (*Department of Health Care Services v. Office of Administrative Hearings* (2016) 6 Cal.App.5th 120, 140.) And when the petitioning party challenges the penalty imposed by the administrative agency, we review de novo whether the agency's imposition of that penalty constituted an abuse of discretion by the agency. (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627.) "But we will not disturb the agency's choice of penalty absent "'an arbitrary, capricious or patently abusive exercise of discretion'" by the administrative agency." (*Id.* at pp. 627-628.)

C. *Arguments on Appeal*

IVS/Vara raise essentially the same issues on appeal that they raised in the trial court.[14] They contend (1) the Board applied the incorrect standard of proof; (2) the Board improperly relied upon IVS's billing practices and its internal policies in sustaining the first cause for discipline; (3) the weight of the evidence did not support the Board's finding that Vara performed the duties of a pharmacist (the third and fourth causes for discipline); (4) the Board improperly sustained the sixth cause for discipline because there was no evidence that IVS intended to deceive when it used the name "IV Solutions Clinical Pharmacy" on some documents or supplies; and (5) the Board abused its

---

[14] At oral argument, IVS/Vara's counsel noted that he had overlooked that the ALJ did not apply the preponderance of the evidence standard to all of the findings regarding IVS/Vara, but he argued that to the extent the ALJ did apply that standard, it was error.

discretion in choosing revocation of IVS's license as the punishment. None of their arguments prevail.

### 1. *Standard of Proof at Administrative Hearing*

IVS/Vara argue that the Board improperly "applied a preponderance of the evidence standard as opposed to the much more stringent clear and convincing standard." This argument ignores the actual findings of the Board.

It is true that the Board agreed with the ALJ's determination that the appropriate standard of proof applicable to an administrative revocation proceeding involving a pharmacy is the preponderance of the evidence standard. But the Board concluded, after considering the entire record, that "regardless of the applicable standard of proof, each cause of action found to be proved in the Proposed Decision . . . was, in this case, proven by clear and convincing evidence." Then, in adopting the ALJ's proposed decision, the Board expressly modified the ALJ's findings and conclusions to state that *all* findings and conclusions were established by clear and convincing evidence.

In sum, because the Board found that all of the findings and conclusions were established by clear and convincing evidence, we need not address IVS/Vara's argument that such a standard of proof was *required* in this case.

### 2. *First Cause for Discipline*

The first cause for discipline relates to the complaints filed by patients J.M. and R.M. The accusation alleged that IVS engaged in

33

conduct that involved "moral turpitude, dishonesty, fraud, deceit, or corruption" (§ 4301, subd. (f)) with regard to those patients.

### a. *The Board's Findings and Conclusions*

The Board found, by clear and convincing evidence,[15] that IVS had a duty to disclose its pricing and billing information to J.M. and R.M. but intentionally failed to do so. It found that the duty to disclose was created when IVS developed written policies and procedures (P&Ps), which were required for IVS to be accredited by the Joint Commission, and that IVS needed that accreditation to do sterile compounding without a Board permit.[16]

The P&Ps at issue required IVS to disclose to J.M. and R.M., at the outset of services and thereafter, the costs of care for which they would be responsible, the potential for insurance reimbursement, and their financial obligations for items not reimbursed by insurance. The P&Ps also required IVS to provide to each patient an itemized explanation of charges and a written explanation of the cost of care and the patient's responsibility for those costs; they also required that an

---

[15] As noted, although the ALJ's proposed decision made this finding by a preponderance of the evidence, when the Board adopted the proposed decision after granting IVS's motion for rehearing it modified the findings to the extent the decision stated they were found by a preponderance of the evidence and found they were established by clear and convincing evidence.

[16] At the time the events at issue took place, IVS could not do sterile compounding unless it was accredited by the Joint Commission or another approved organization, or obtained a sterile compounding license from the Board.

IVS employee or agent explain these rights and obligations to the patient.

The Board found that IVS intentionally withheld this information from J.M. and R.M.  It also found that IVS exacerbated this situation by creating and giving paperwork to the patients stating that IVS would provide some of this information to them only if they were going to be held financially responsible for some or all of the charges.  IVS also required the patients to sign a document that included an agreement to be financially responsible for any costs not reimbursed by insurance.  In other words, IVS's own paperwork was contrary to its P&Ps.

The Board noted that IVS was not required to disclose to J.M. or R.M. that it was an out-of-network provider under its P&Ps or any other general duty.  But it observed that IVS's out-of-network status allowed it to charge significantly more for its drugs than it could have charged had it been in-network, which the Board determined provided the motive for IVS to not provide the information required by its P&Ps: if J.M. and R.M. had been given that information they likely would have complained about IVS's "exorbitant prices" and immediately stopped using IVS for the treatments.  In fact, the Board found that IVS intentionally delayed and withheld most of its bills for J.M.'s treatment until after the treatment had been completed, so as not to alert J.M.'s wife about its charges before the insurer made its reimbursement decisions.  And, although the Board acknowledged that a showing of damages, injury, or harm to the patients was not required, it found that both patients suffered harm, including that IVS's charges exhausted or seriously depleted the patients' lifetime maximum insurance benefit

amount, even though both of them were likely to need significant medical services in the future.

The Board thus concluded that clear and convincing evidence established that IVS "intentionally acted in a deceitful manner as to patients J.M. and R.M. by concealing information from them that it had a duty to provide, which conduct was motivated by a desire to maximize charges to the patients' insurance companies. By engaging in such conduct, [IVS] acted contrary to justice, honesty, modesty or good morals, which constitutes moral turpitude. For those reasons, it was established by [clear and convincing] evidence that [IVS] violated section 4301, subdivision (f)."

### b. *The Trial Court's Ruling*

In its ruling denying IVS/Vara's writ petition, the trial court found that the Board[17] properly relied upon IVS's failure to disclose the costs of care and its delayed billing in concluding that IVS violated section 4301, subdivision (f).

### i. *Failure to Disclose Cost of Care*

Addressing IVS/Vara's contention that the Board improperly based its conclusion on evidence that IVS failed to abide by its own

---

[17] We note that throughout its ruling the trial court generally refers to "the ALJ's" findings and decision, even though it is the *Board's* findings and decision that is subject to review. The trial court's references to the ALJ's findings and decision has no effect on the analysis, however, since the Board adopted those findings and decision (with the modification that all findings and conclusions were established by clear and convincing evidence).

internal policies, the trial court found that IVS's conduct fell within the broad range of conduct described in section 4301, subdivision (f), i.e., "act[s] involving moral turpitude, dishonesty, fraud, deceit, or corruption."

The court pointed to testimony by the Board's expert witness, Dr. John D. Jones, that IVS adopted certain P&Ps as part of the process of accreditation by the Joint Commission, and that obtaining that accreditation confers advantages because many prescribers only refer patients to pharmacies that are accredited by the Joint Commission. The court noted that the P&Ps IVS adopted for accreditation included a "Patient Bill of Rights and Responsibilities" that stated, in relevant part: "As a home care patient you have the right to: [¶] . . . [¶] Be informed in advance of potential reimbursement for services under Medicare, Medicaid, or other third party insurers based on your condition and insurance, of any financial obligations for services not fully reimbursed, and to be notified of any changes in charges for which you may be liable during the course of care and service[;] [¶] [and] [r]eceive an itemized explanation of charges."

But the court observed that the document entitled "Patient's Rights and Responsibilities" that IVS gave to J.M and R.M. stated only that "[a]s a client you have the right to: [¶] . . . [¶] Know in advance if you will be responsible for any cost other than your co-payment and yearly deductible that are predetermined by your medical insurance policy and Medicare/Medi-Cal regulations." In addition, the court cited to testimony by Casillas, IVS's chief financial officer, that it was IVS's policy not to disclose that it was an out-of-network pharmacy or to

disclose in advance the amount it would bill to the patient's insurer. The court also noted that IVS required patients to sign a form that included the following statement: "I understand that I am personally and financially responsible for all billed charges, including interest, and late fees' [*sic*] for all products and services provided by IVS that are for any reason whatsoever not reimbursed by my insurance, or Medicare/MediCal/CalOptima."

Based on this evidence, the trial court concluded that the Board's reliance upon IVS's failure to disclose its costs of care to J.M. and R.M. in finding that IVS engaged in unprofessional conduct was proper. The court observed that the language of the statute permits the Board to take disciplinary action against a licensee for a wide range of "unprofessional conduct," regardless whether that conduct violates a law or regulation. And the court found that IVS's conduct in this instance—adopting disclosure requirements in order to receive the accreditation it needed to do sterile compounding (and which conferred significant advantages) but then adopting practices that do not provide those disclosures—"falls within the broad range of 'act[s] involving moral turpitude, dishonesty, fraud, deceit, or corruption'" as described in section 4301, subdivision (f).

### ii. *Delayed Billing*

The trial court also addressed IVS/Vara's contention that the evidence did not support the Board's finding that IVS intentionally delayed sending most of its bills to J.M.'s insurer until after J.M. had completed his treatment. The court acknowledged the evidence IVS had

38

presented that billing can be delayed by "the administrative burden of doing claims processing," and that providers generally get a better response when they wait until the end of service and submit a single claim instead of submitting multiple claims throughout the treatment period. But the court found that Vara's explanation about how IVS billed patients' insurers was not consistent with how IVS billed J.M. or R.M. For example, Vara testified that IVS bills at regular intervals for treatments that last for long periods of time, but that it waits until the end of treatment to bill for treatments that last four to six weeks. Vara also explained that IVS prefers to bill for the entire treatment at one time so the insurer has the authorization for the entire course of treatment and does not mistake multiple billings for duplicates. But the court noted the evidence showed that, although IVS did not send the first bill for R.M.'s treatment until near the end of the treatment, it sent multiple bills on several different days rather than a single bill at the end of treatment. And with regard to J.M., the evidence showed that IVS sent bills to the insurance company after the first three months of treatment (covering the first two months), but after J.M.'s wife complained about charges, IVS did not send another bill to the insurer for a year (sending the bill four months after J.M.'s treatments ended).

Based upon this evidence, the court found the Board reasonably concluded that IVS intentionally delayed submitting bills for J.M.'s treatment to his insurer. Considering that intentional delay along with IVS's failure to disclose the cost of treatment and its out-of-network status, the court found that the Board reasonably concluded that IVS

39

delayed that billing "in a concerted effort to avoid providing J.M.'s wife with information about its charges."

c. *Arguments on Appeal*

On appeal, IVS/Vara argue the Board abused its discretion by basing its determination sustaining the first cause for discipline on IVS's billing practices because: (1) the Board did not have jurisdiction to address billing issues; (2) the Board improperly based its decision on IVS's alleged failure to follow an internal policy IVS voluntarily adopted; and (3) the Board improperly relied upon IVS's delay in billing J.M. in finding IVS was guilty of moral turpitude and deceit. We note that in making these arguments, IVS/Vara completely ignore the trial court's rulings and the standards of review governing our review in this case. We respond to each issue applying the appropriate standard of review for that issue.

i. *Board's Jurisdiction*

IVS/Vara contend, in essence, that the Board committed an error of law by taking disciplinary action based upon billing issues. We review this contention under the de novo standard of review, and find it has no merit.

There is no dispute that the Board does not have jurisdiction over complaints regarding a pharmacy's pricing of prescription drugs or billing disputes with a patient's insurance company. But it does not follow that, as IVS/Vara appear to assert, this lack of jurisdiction to address complaints about pricing or billing precludes the Board from

40

considering any evidence related to the prices a pharmacy charged or the timing of their billing when determining whether the pharmacy engaged in unprofessional conduct as defined in section 4301, subdivision (f).

In this case, the Board did not discipline IVS for the prices it charged or billing disputes with patients' insurers. Rather, it considered evidence of the extremely high prices IVS charged for J.M.'s and R.M.'s treatments as evidence showing IVS's motive for not following its P&Ps that required it to disclose the costs of care to patients before treatment starts. And it considered evidence of IVS's billing practices, particularly its extraordinary delay in submitting bills to J.M.'s insurer after J.M.'s wife had complained about the prices charged for the first two months of treatment, as evidence showing IVS's intent to prevent J.M. from discovering the amounts IVS was charging until after the treatment ended. In other words, the Board considered the evidence of IVS's pricing and billing practices not to determine whether the pricing and billing practices themselves violated any statutes, rules, or regulations. Instead, that evidence went to whether IVS intended to deceive J.M. and R.M., and its motive for that deception. The Board did not err by considering it in that context.

ii.    *Failure to Follow Internal Policy*

IVS/Vara contend (1) it was improper for the Board to base its finding of unprofessional conduct on IVS's failure to follow its own internal policies because a finding of moral turpitude must be based upon a wrongdoing that involves a violation of a clearly defined law or

41

regulation, and cannot be premised on the failure to follow a term of accreditation by a private entity; and (2) the weight of the evidence does not support the Board's finding that IVS failed to follow its policies.

The first contention presents an issue of law, which we review de novo. We find no merit to the contention.

First, in arguing that a finding of "unprofessional conduct" under section 4301, subdivision (f) must be based upon a violation of a clearly defined law or regulation, IVS/Vara focus only on cases in which the "unprofessional conduct" findings were based upon acts involving moral turpitude. But section 4301, subdivision (f), is not limited to such acts. That subdivision also defines "unprofessional conduct" to include acts involving "dishonesty, fraud, deceit, or corruption." (§ 4301, subd. (f).)

Second, there is nothing in the language of section 4301, subdivision (f), indicating that the act at issue must involve the violation of a statute or regulation. Indeed, it expressly provides that the act need not be a felony or misdemeanor.

Finally, as the trial court's ruling makes clear, the act in this case that constituted "unprofessional conduct" was not simply IVS's failure to follow its P&Ps. Instead, it was IVS's conduct in adopting a policy in order to obtain the accreditation it was required to have to do sterile compounding and that gave it significant business advantages, but then, once it obtained that accreditation, adopting a different policy that was contrary to the original policy. As the trial court stated, this conduct clearly "falls within the broad range of 'act[s] involving moral turpitude, dishonesty, fraud, deceit, or corruption'" that constitute "unprofessional conduct" under section 4301, subdivision (f). Thus,

42

Board did not err in considering IVS's failure to follow its P&Ps when it found that IVS engaged in "unprofessional conduct."

As noted, IVS/Vara also challenge the finding of "unprofessional conduct" on the ground that the weight of the evidence does not support the Board's finding that IVS violated its internal policies because the Board ignored certain testimony by Casillas. In making this contention, IVS/Vara ignore the applicable standard of review. Our task on review is to determine whether there is substantial evidence to support the *trial court's* conclusion that the Board's finding was supported by the weight of the evidence. (*Fukuda, supra,* 20 Cal.4th at p. 823.) IVS/Vara do not discuss the evidence the trial court relied upon at all. In fact, they do not even discuss the evidence the *Board* relied upon; instead, they discuss only the testimony they assert the Board purportedly ignored.

As we explained in *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, "when the substantial evidence standard of review applies, the appellant is required "'to demonstrate that there is *no* substantial evidence to support the challenged findings." . . . A recitation of only [the appellant's] evidence is not the "demonstration" contemplated under the above rule. [Citation.] Accordingly, [when appellants] contend [that] "some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error assigned is deemed to be waived."'" (*Id.* at p. 514.) Because IVS/Vara have not addressed the trial court's conclusion that

43

the weight of the evidence supports the Board's finding, or the evidence relied upon by the trial court in reaching this conclusion, they have forfeited their claim.

### iii. *Delay in Billing*

IVS/Vara contend the weight of the evidence does not support the Board's determination that IVS committed an act of moral turpitude or deceit by delaying its billing with regard to J.M. To make this argument, they question the credibility of the Board's expert witness, and question the Board's reliance upon the testimony of one witness (Vara) over the testimony of another (Casillas). Not only do IVS/Vara again ignore that our review is of the *trial court's* determination, the questions they raise are questions that cannot be considered under the standard of review applicable here.

As noted, it is the trial court that determines if the weight of the evidence supports the Board's findings. On appeal, we do not weigh the evidence, and instead review the trial court's finding under the substantial evidence standard of review. (*Fukuda, supra*, 20 Cal.4th at p. 823.) Under that standard of review, "'"the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the [trial court's] determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing

44

other reasonable inferences, might have reached a contrary conclusion.""'" (*Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 683-684.) Moreover, "we do not evaluate the credibility of the witnesses. . . . Rather, 'we defer to the trier of fact on issues of credibility.'" (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514-515.)

In this case the trial court acknowledged the evidence IVS/Vara presented that IVS did not intentionally delay in submitting its bills for J.M.'s treatment. But the court cited to evidence showing inconsistencies between how Vara testified IVS billed patients' insurers (Vara testified that for four-to-six-week treatments IVS waits until the end of treatment to submit everything at the same time, but it submits at regular intervals for longer treatments) and how IVS actually billed the insurers for J.M. and R.M. (IVS submitted multiple bills on several days for R.M.'s treatment, and submitted one bill after the first two months of J.M.'s 10-month treatment but did not submit any other bill until four months after the treatment ended. ). Thus, substantial evidence supported the court's finding that the Board reasonably inferred, based upon those inconsistencies, that IVS's delay in submitting J.M.'s bills was intentional.

3.   *Third and Fourth Causes for Discipline*

The third and fourth causes for discipline alleged violations of California Code of Regulations, title 16, section 1793.1 (Regulation 1793.1) based upon Vara's conduct in responding to calls from the family of D.K. regarding problems they were having with the

45

prescription Curlin pump that IVS had provided. Regulation 1793.1 sets out duties that only a pharmacist, or an intern pharmacist acting under the supervision of a pharmacist may perform. Those duties include: "Consult with a patient or his or her agent regarding a prescription, either prior to or after dispensing" (Reg. 1793.1, subd. (b)); "Consult with any prescriber, nurse or other health care professional or authorized agent thereof" (Reg. 1793.1, subd. (e)); and "Perform all functions which require professional judgment" (Reg. 1793.1, subd. (g)).

The third cause for discipline alleged that Vara violated subdivisions (b) and (e) of Regulation 1793.1, and the fourth cause for discipline alleged that Vara violated subdivision (g). Because the facts and argument regarding both causes are the same, we will discuss both causes together.

a.    *The Board's Findings and Conclusions*

The Board found that Vara responded to calls made to IVS by members of patient D.K.'s family (Kevin and Donna) about the Curlin pump, which the family members believed had malfunctioned and administered an improper dose of medication to D.K. overnight. The Board found that after being notified of the family's calls and learning that PIC Sadow was on vacation, Vara decided to handle the matter himself. When both Kevin and Donna asked, in separate calls, that the pump be replaced, Vara made the decision to deny their requests. And when Donna asked to speak with a pharmacist, Vara told her that he was the person she should speak to.

46

The Board found that any decision regarding the equipment involved in dispensing prescribed medication was a decision that must be made by a licensed pharmacist. It noted that, although Vara had every right to take the initial calls from the family and decide where to direct them, by making the decision by himself—without the involvement of a licensed pharmacist—that the pump was not malfunctioning and did not need to be replaced, he improperly consulted with a patient's family concerning a prescription.

Based upon these findings, the Board concluded that Vara violated Regulation 1793.1, subdivisions (b) and (g).[18]

b. *The Trial Court's Ruling*

The trial court found the evidence established that Kevin and Donna spoke with Vara several times on the day in question, asking to speak to a pharmacist and that the pump be replaced, and that Vara refused to replace the pump or direct their calls to a pharmacist. The court also noted there was no admitted evidence that Vara ever consulted with a licensed pharmacist to determine whether the pump was functioning properly. Instead, the court found the evidence showed that the only time Vara spoke to a pharmacist that day was when Sadow spoke to him early that morning, and that she only confirmed with him that she was on vacation and that he needed to call the pharmacist on call, Jeannie Kim. The court also noted there was

_____

[18] The Board concluded it was not established that Vara violated Regulation 1793.1, subdivision (e).

47

evidence that, because a Curlin pump is classified as a "dangerous device," a licensed pharmacist must make the judgment call about whether a pump is working properly or should be replaced.

Based upon this evidence, the court concluded that the weight of the evidence supported the Board's determination that Vara performed the duties of a licensed pharmacist in violation of Regulation 1793.1, subdivisions (b) and (g).

c.     *Argument on Appeal*

IVS/Vara contend the weight of the evidence does not support the Board's finding the Vara performed the duties of pharmacist.  Once again, IVS/Vara ignore our role on review and the limits of the substantial evidence standard of review.[19]

IVS/Vara's argument is based primarily upon their assertions of conflicts in the evidence and lack of credibility of the Board's witnesses. When those assertions are removed, what is left is IVS/Vara's admission that "all that was established" was that Vara received the phone calls from D.K.'s family complaining about the pump and asking for it to be replaced, and that Vara declined to replace the pump and

---

[19]     We note that IVS/Vara spend a significant portion of their argument citing to evidence to show that "D.K.'s family members' conversations with two nurses [on the dates the pump seemed to be malfunctioning] . . . fulfilled any pharmacist consult requirement that existed."  But the third and fourth causes for discipline did not allege that IVS failed to have consultation available with regard to D.K.; the only cause for discipline related to IVS's failure to have consultation available was the twelfth cause for discipline, which was based upon the incident involving patient C.R.

instead sent a nurse to reprogram it after speaking with the pump's manufacturer.[20]  But those facts constitute substantial evidence sufficient to support the trial court's finding that the weight of the evidence supports the Board's conclusion that Vara violated Regulation 1793.1, subdivisions (b) and (g).

### 4. *Sixth Cause for Discipline*

The sixth cause for discipline alleged that on at least two occasions, prescription labels were used that falsely represented the name of the pharmacy as "IV Solutions Clinical Pharmacy," an unknown, unlicensed pharmacy, instead of "IV Solutions, Inc.," the name on the license issued by the Board.  Therefore, IVS and PIC Sadow are subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (f), (j), (o), and (p) for violating section 4078, subdivision (a)(1), and section 4076, subdivision (a)(6).

Section 4078, subdivision (a)(1) provides:  "No person shall place a false or misleading label on a prescription."  Section 4076, subdivision (a)(6) provides:  "A pharmacist shall not dispense any prescription except in a container that meets the requirements of state and federal law and is correctly labeled with all of the following:  [¶] . . . [¶]

---

[20]    IVS/Vara also assert the evidence showed that Vara spoke with IVS's pharmacist.  But the trial court found that he spoke only to Sadow,  that Sadow only told him that she was on vacation and that he needed to speak to Jeannie Kim, and that Vara never spoke to Kim that day.  Substantial evidence supports this finding.

(6) The name and address of the pharmacy, and prescription number or other means of identifying the prescription."

### a.  *Board's Findings*

The Board found that on April 2 and 7, 2010, PIC Sadow used prescription labels that represented the name of the pharmacy as "IV Solutions Clinical Pharmacy" instead of "IV Solutions, Inc." It found that Sadow did not make the decision to use that name, but instead "simply went along with the practice." It also found there was no evidence of any intent to deceive the public, but rather the intent was "to denote that this was a closed, clinical pharmacy that mixed its own IV solutions and medications." The Board noted that Casillas and Sadow were surprised to learn that use of that name was improper, and immediately stopped using it.

The Board concluded that IVS is subject to disciplinary action for unprofessional conduct under section 4301, subdivisions (f), (j), (o), and (p) for violating section 4078, subdivision (a)(1), and section 4076, subdivision (a)(6).

### b.  *Trial Court's Ruling*

In the trial court, IVS/Vara challenged the Board's ruling on the sixth cause for discipline on a single ground:  they argued that the Board erred in concluding their use of the name "IV Solutions Clinical Pharmacy" constituted "unprofessional conduct" under section 4301, subdivision (f), because the Board found that the name was not used with the intent to deceive the public.  The trial court rejected their

argument, finding that doing business under an unlicensed name in violation of section 4078, subdivision (a)(1)—the same conduct for which IVS previously had been cited for using the name "Stat Clinical Pharmacy"—"falls within the broad range of dishonest, fraudulent, and deceitful conduct for which the Board is authorized to take action under Section 4301(f)." The court also noted that, in any event, violation of section 4078, subdivision (a)(1), was independently actionable under the other subdivisions of section 4301 cited by the Board: subdivision (j) ("The violation of any of the statutes of this state"); subdivision (o) ("Violating . . . any provision or term of [the Pharmacy Law]"); and subdivision (p) ("Actions or conduct that would have warranted denial of a license").

        c.    *Argument on Appeal*

IVS/Vara begin their argument here with a misstatement of the record. They state: "On the 6th cause, the Board found that IVS' use of the name 'IV Solutions Clinical Pharmacy,' instead of 'IV Solutions, Inc.' on a few prescription labels constituted acts of moral turpitude and deceit." They then argue this was error because the Board found there was no evidence IVS intended to deceive the public by using the different name.

There are two problems with IVS/Vara's argument. First, the Board did not find that IVS's use of the name constituted acts of moral turpitude and deceit. Rather, it found that the use of the name fell within the broad range of conduct described in section 4301, subdivision (f)—i.e., "act[s] involving moral turpitude, dishonesty, fraud, deceit, *or*

51

corruption." (Italics added.) Thus, as the trial court found, the Board reasonably could have found that IVS's use of the name was dishonest, particularly in light of the fact that IVS previously had been cited for using another unlicensed name.

Second, the Board found that IVS's use of the name constituted "unprofessional conduct" under other subdivisions of section 4301, in addition to subdivision (f), and the trial court found the weight of the evidence supported those findings. IVS/Vara do not challenge the trial court's ruling or those findings. Because IVS/Vara failed to do so, they have forfeited their challenge to the sixth cause for discipline. (*Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 571-572 [on appeal, trial court's ruling are presumed correct; where ruling was based upon multiple grounds and appellant addresses only one ground, appellant's challenge to ruling is forfeited].)

### 5. *Punishment*

IVS/Vara contend the Board abused its discretion by imposing revocation as the penalty for the sustained causes for discipline. They argue the Board incorrectly applied the Guidelines and improperly relied upon IVS's pricing in choosing revocation. They also argue that revocation was inappropriate because only 12 of the 21 alleged causes for discipline were sustained, and most of the sustained violations were unintentional. We disagree.

### a. *Incorrect Application of the Guidelines*

As noted, the Guidelines set forth four categories of violations for which the Board may take disciplinary action. For each category, the Guidelines list "statutes and regulations where violations would typically merit the recommended range of minimum to maximum penalties for that category." (Guidelines, p. 5.) The Guidelines instruct: "These categories assume a single violation of each listed statute or regulation. For multiple violations, the appropriate penalty shall increase accordingly. Moreover, if an individual has committed violations in more than one category, the minimum and maximum penalties shall be those recommended in the highest category." (*Id.*)

The Guidelines also list 15 factors to be considered by the Board in determining penalties, with the following guidance: "No single one or combination of the [listed] factors is required to justify the minimum and/or maximum penalty in a given case, as opposed to an intermediate one." (Guidelines, p. 3.) The listed factors, some of which are not applicable to this case, are: (1) actual or potential harm to the public; (2) actual or potential harm to any consumer; (3) prior disciplinary record; (4) prior warnings, including citations and fines; (5) number and/or variety of current violations; (6) nature and severity of the acts or offenses under consideration; (7) aggravating evidence; (8) mitigating evidence; (9) rehabilitation evidence; (10) compliance with terms of any criminal sentence, parole, or probation (not applicable here); (11) overall criminal record (not applicable here); (12) evidence of proceedings for case being set aside and dismissed under Penal Code section 1203.4 (not applicable here); (13) time passed since the acts or offenses;

(14) whether the conduct was intentional or negligent or demonstrated incompetence; and (15) financial benefit to the respondent from the misconduct. (Guidelines, p. 3.)

### i. *Mischaracterizing Violations*

IVS/Vara argue that the Board improperly characterized the first, sixth, and seventh causes of discipline as Category II, Category II/III, and Category III, respectively,[21] when all three should have been characterized as Category I violations, and that, in imposing revocation, the Board improperly treated all violations as having been Category III. They are mistaken.

With regard to the first cause for discipline (failure to disclose information to patients J.M. and R.M.), IVS/Vara argue that the conduct at issue was, at most, a violation of section 4122, subdivision (b), which requires pharmacies to provide, upon request, the current retail price for any drug sold at the pharmacy; under the Guidelines, a violation of section 4122 is a Category I violation. But the Board did not find that the conduct was a violation of section 4122. It found that the conduct constituted "unprofessional conduct" under section 4301, subdivision (f). The trial court found the weight of the evidence supported the Board's conclusion that the conduct fell within section 4301, subdivision (f), and we found that substantial evidence supports

---

[21] We note that the trial court found that the Board erred in characterizing the sixth cause for discipline as Category II/III, finding it was a Category II violation.

the trial court's finding. The Guidelines do not list section 4301, subdivision (f) under Category I; it is listed as a Category II violation. (Guidelines, pp. 6-11, 13.) Thus, the Board did not abuse its discretion by characterizing the first cause for discipline as a Category II violation.

IVS/Vara contend the sixth cause for discipline (false and misleading label on a prescription) could not be considered a Category II or Category III violation because the Board found that IVS's use of the false pharmacy name was a violation of section 4078, subdivision (a)(1), which is listed in the Guidelines as a Category I violation. This argument is disingenuous. The sixth cause for discipline alleged and sustained a violation of both section 4078, subdivision (a)(1), and section 4076, subdivision (a)(6). While IVS/Vara are correct that a violation of section 4076 is listed in the Guidelines as a Category I violation, a violation of section 4078 is listed as a Category II violation. (Guidelines, pp. 6, 12.) Therefore, as the trial court found, the sixth cause for discipline properly was characterized as a Category II violation.

IVS/Vara's argument regarding the seventh cause for discipline does not address at all the statute the Board found IVS violated. Instead, they argue the violation should not have been characterized as a Category III violation because it involved "a minor record keeping error" and appeared to be inadvertent. However, the statute the Board found IVS had violated—section 4081, subdivisions (a) and (b)—is listed under Category III, not Category I. (Guidelines, p. 16.) Had the seventh cause for discipline been the only cause that was sustained, IVS/Vara's argument might have been an appropriate argument for the

55

minimum penalty allowed. But in light of the statute found to have been violated, the Board did not abuse its discretion by characterizing the seventh cause as a Category III violation.

Nor did the Board abuse its discretion by concluding it should "treat[] the totality of the violations to be in the highest category, here Category III," as IVS/Vara argue. IVS/Vara acknowledge that the Guidelines instruct that the range of penalties to be applied when there are violations in more than one category is the range applicable to the highest category in which any of the violations is found. But they argue this does not mean that the Board was required to treat all of the violations as equally severe as the most severe violation when determining the penalty, as it contends the Board did in this case. We disagree with that contention.

Viewed in context, it is clear that in stating that it would "treat[] the totality of the violations to be in the highest category," the Board was referring to the range of penalties applicable to all of the violations rather than the severity of the violations. Immediately following the statement, the Board stated: "Such treatment appears warranted given the fact that the bulk of violations are in or near Category III. Moreover, the difference between the two categories [i.e., Category II and III] is without significant distinction. The suggested discipline for both categories ranges from a minimum of probation for a number of years under various terms and conditions to a maximum of revocation." In other words, the focus of the Board was on the range of penalties it was to consider in light of the 15 factors as applied to all of the violations as a whole. The Board then turned to and applied the

56

factors, taking into account, as the Guidelines instruct, that "[f]or multiple violations, the appropriate penalty shall increase accordingly." (Guidelines, p. 5.) The Board did not abuse its discretion in doing so.

ii. *Failure to Consider/Misapplication of Factors*

IVS/Vara contend the Board misapplied "a number" of the 15 factors to be considered in determining the appropriate penalty under the Guidelines. However, in their discussion they identify only two— the second and the ninth factors (actual or potential harm to any consumer, and evidence of rehabilitation, respectively). We find no abuse of discretion in how the Board applied those factors.

A. <u>Actual or Potential Harm to Consumers</u>

The Board found that actual or potential harm to consumers was demonstrated in four instances: (1) Dr. Spitzer, a physician who referred his patients to "Stat Clinical Pharmacy," was defrauded because IVS used that name to avoid detection after Dr. Spitzer refused to refer his patients to IVS (fourteenth cause for discipline); (2) patient D.K. received only two weeks of his six-week regimen of IV antibiotics due to the confusion over whether the Curlin pump malfunctioned (third and fourth causes for discipline); (3) patient C.R. was unable to receive her prescribed IV morphine for her post-surgery pain because IVS was unavailable for consultation regarding the Curlin pump (twelfth cause for discipline); and (4) patients J.M. and R.M. suffered significant harm because at the time of the incidents, both had lifetime insurance benefit caps that were exhausted (J.M.) or significantly

57

depleted (R.M.) due to IVS charging multiple-times more for their treatments than in-network pharmacies would have charged, and J.M. was additionally harmed because IVS filed a lawsuit seeking more than $2 million against him and his wife (first cause for discipline).

IVS/Vara contend the Board misapplied this factor, because three of the four instances the Board identified do not, in fact, demonstrate harm to a consumer. We disagree.

First, IVS/Vara contend the Board's finding that Dr. Spitzer was defrauded does not demonstrate harm to a consumer because "as a matter of law Dr. Spitzer was not a consumer and therefore under the Guidelines, harm that he suffered was not relevant to this factor." IVS/Vara do not cite to any law in support of their assertion that Dr. Spitzer was not a consumer as a matter of law. In fact, the term "consumer" is not defined in the Pharmacy Law. It is not unreasonable to conclude, as the Board apparently did, that a consumer of specialized pharmacy services such as the services IVS offered includes not just the patient, but also the physician who refers the patient to a specific pharmacy, especially when he does so to avoid using a particular pharmacy.

Second, IVS/Vara argue that D.K. was not harmed by Vara's conduct with regard to the Curlin pump because D.K.'s family *elected* to take D.K. off of the pump, and D.K. completed his regimen with oral medications. But IVS/Vara ignore the fact that D.K.'s doctor had prescribed an IV treatment rather than oral medication and that D.K.'s family took D.K. off of the pump because of their interactions with Vara,

during which he cursed at them and refused to replace the pump or let them talk to a pharmacist.[22]

Third, IVS/Vara argue that "[t]he alleged 'significant harm' to J.M. and R.M. . . . is a fabrication of the Board" because J.M.'s and R.M.'s insurers paid for their treatments, and because IVS's lawsuit against J.M. did not cost J.M. anything since his attorney fees were paid by the insurance proceeds. In making this argument, IVS/Vara completely ignore the harm the Board identified in its decision.

To be fair, the Board did not specifically identify the "significant harm" J.M. and R.M. suffered in its discussion of the second factor, instead stating: "As chronicled in detail above, patients J.M. and R.M. sustained significant harm." But the Board's decision included an entire section—with the heading "Damages"—in its findings of fact with respect to J.M. and R.M., showing the "significant harm" they suffered as a result of IVS's failure to disclose the costs of treatment.

In short, the Board did not abuse its discretion in applying the second factor when determining the appropriate penalty to impose.

---

[22] We note that, even though IVS eventually resolved the problem with the pump, it took almost 24 hours. D.K's family started having trouble with the pump the evening before they spoke to Vara, when the alarm would not stop going off. IVS was called before 5:00 a.m. the following morning, because D.K.'s family thought the pump had administered all of the medication at once. It was not until 6:00 p.m. that evening that Vara sent a nurse to D.K.'s home to fix the pump. Thus, D.K. was unable to get his IV medications for the entire day.

B.    Rehabilitation

In addressing the ninth factor, evidence of rehabilitation, the Board stated: "[IVS/Vara] essentially provided none. No evidence was presented at the hearing indicating that [IVS/Vara] are now doing things differently in light of this case. In fact, Mr. Vara accepted very little responsibility for his misconduct. Instead, in their pre-trial motions and closing briefs, Mr. Vara and IV Solutions have accused the Board of wrongdoing."

IVS/Vara contend that in reaching this conclusion, the Board ignored uncontradicted evidence of IVS/Vara's rehabilitation and its own findings, citing several examples. We have examined every one of their citations and find that almost none of that evidence demonstrates rehabilitation with respect to the violations found by the Board.

For example, IVS/Vara cite to evidence or findings that IVS had no prior record of discipline and, when IVS received citations in the past, it paid the fines without appeal and addressed the issues immediately. IVS/Vara also cite to evidence that they always cooperated with the Board's investigations. While this evidence might be evidence of other factors (such as mitigation), it is not evidence of rehabilitation with respect to the violations in this case.

IVS/Vara also cite to testimony by Vara and Casillas that IVS always took corrective actions and took steps necessary to prevent future "mistakes." But the testimony they cite is entirely general; they do not cite to evidence of specific steps taken to prevent future

60

occurrences of most of the violations at issue.[23]  Moreover, the Board had reason to doubt the veracity of Vara's and Casillas testimony that IVS had, in fact, corrected their "mistakes."  For example, although IVS provided a statement to the Board that upon receiving the citation for receiving and holding misbranded drugs (Lovenox) from Canada it immediately shipped the medication back to the supplier, a Board inspector later found several misbranded vials of Lovenox from Canada at the pharmacy.

In addition to the cited testimony, IVS/Vara point to "over a hundred pages" of documentary evidence they contend reflects "IVS' efforts to respond to and remediate the issues raised by the Board."  Most of those pages do not pertain to the sustained violations in this case.  A few pages relate to the two violations for which we acknowledge IVS presented evidence of rehabilitation, the second and seventeenth causes for discipline.  (See fn. 23, *ante*.)  And while the remainder do address some of the sustained violations, they do not show rehabilitation—i.e., evidence that IVS implemented polices to prevent future violations—for a variety of reasons.

For example, several of the cited pages address the incident with patient D.K.  They include a narrative explaining in detail what Vara purportedly did in responding to the calls from D.K.'s family.  According

[23]     There are two exceptions.  There is evidence that IVS immediately stopped obtaining Curlin pumps from the unlicensed wholesaler and researched to find a licensed one (second cause for discipline) and that it set up a lock box for the key to the pharmacy and a system to ensure that only the pharmacist can access it (seventeenth cause for discipline).

61

to the narrative, Vara consulted with Sadow multiple times and worked to resolve the issue with D.K.'s pump in consultation with the pharmacist and the technical support person from the pump manufacturer. Far from demonstrating rehabilitation, this evidence demonstrates IVS/Vara's refusal to recognize that any violation occurred, in light of the Board's finding that the evidence shows Vara had only one call with a pharmacist, Sadow, who testified that she did not "consult" with him but instead told him to speak to the pharmacist on call.[24]

Other pages of the cited evidence purport to show that IVS immediately returned all of the misbranded Canadian Lovenox to the supplier. But, as noted above, that was found to be untrue when an inspector later found several vials of it at the pharmacy.

Finally, some of the pages IVS/Vara cite to demonstrate a *lack* of rehabilitation. IVS/Lara cite to IVS's response to the citation it received for using the name "Stat Clinical Pharmacy" on some of their documents. IVS stated that it used that name for marketing purposes[25] and was not aware that the use of that name violated any provisions of the Pharmacy Law; it stated it would stop using the false name immediately. Yet a year later, IVS was cited for using the false name

---

[24] In any case, the Board expressly stated in its findings that it disregarded most of the information in that narrative because it was not contained in D.K.'s patient worksheet or chart.

[25] In fact, as noted above, Vara and others admitted that IVS used the name in order to receive referrals from Dr. Spitzer, who refused to refer patients to IVS.

"IV Solutions Clinical Pharmacy."  IVS responded to that citation by stating that Vara was unaware that IVS could not use that name. Clearly, IVS had not put policies in place to prevent future violations after it was cited for using "Stat Clinical Pharmacy."

In short, while IVS/Vara may be correct that the record is not entirely devoid of evidence of rehabilitation, that evidence is slight and relates to only two of the 12 sustained violations.  As a whole, the record shows that IVS/Vara continue to deny wrongdoing and/or have not put policies in place to prevent future violations as to most of the sustained violations.  As the Board observed, the facts and circumstances regarding IVS's violations "demonstrate such a pattern of willful disregard for the laws pertaining to operating a pharmacy that [IVS] should no longer be able to do so."  The Board did not abuse its discretion in finding a lack of evidence of rehabilitation.

b.    *Improper Reliance on IVS's Pricing*

Seizing on a single sentence in a lengthy paragraph summarizing the reasons for its decision to impose revocation, IVS/Vara contend the Board abused its discretion by relying in part on its pricing in determining the level of discipline.  In fact, the Board clearly states—*in that sentence*—that while the prices IVS charged to J.M. and R.M. were "unsavory," they "were not illegal or the basis for discipline."  As the remainder of the paragraph demonstrates, the Board's revocation decision was based upon several factors, which did not include IVS's pricing.

63

c.    *Only 12 of 21 Causes for Discipline Were Sustained*

IVS/Vara contend that, because the Board initially sought revocation based upon 21 causes for discipline but found that seven of those 21 causes were not established,[26] the Board abused its discretion by imposing revocation based upon only 12 sustained causes.  This is a frivolous contention, without support in logic or law.  The Board properly made its penalty determination based upon the causes that were sustained, not the causes that were alleged.

d.    *Most of the Violations Were Unintentional*

IVS/Vara argues that the Board improperly based its penalty decision on its conclusion that "[m]ost of [the sustained] violations were serious and intentional, the result of dishonesty, deceit or a conscious decision by Mr. Vara to exclude pharmacists from their required duties."  They contend that, in fact, most of the sustained violations (the 2nd, 3rd, 4th, 6th, 7th, 12th, 15th, 16th, 17th, and 21st causes for discipline) "were found to be inadvertent or honest mistakes."  They are wrong.

Of the violations IVS/Vara identified, only two (the 7th and 12th causes) truly could be found to have been inadvertent.  The third and fourth causes were the result of Vara's conscious decision to exclude the pharmacist on call from her required duty to respond to the concerns of D.K.'s family about the prescription Curlin pump.  The remaining causes involve "mistakes" made because the person responsible for the

---

[26]    As noted, one of the causes for discipline was alleged only against PIC Sadow and another was withdrawn.

64

decisions leading to the violations—Vara, in most instances—was unaware that the conduct violated the Pharmacy Law.  In other words, the violations resulted from Vara's conscious decision not to pay attention to the law governing his business, or as the Board put it, his "willful disregard for the laws pertaining to operating a pharmacy." .  Thus, the Board did not abuse its discretion in basing its penalty decision on its determination that most of the violations were intentional.

## DISPOSITION

The judgment is affirmed.  The Board shall recover its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.